USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ Nos. 96-1788, 96-1789, 96-1790, 96-1791, 96-1792, 96-1793, 96-1794, 96- 1842 MILLIPORE CORPORATION, Plaintiff, Appellant, v. THE TRAVELERS INDEMNITY COMPANY, HARTFORD ACCIDENT AND INDEMNITY COMPANY, and INSURANCE COMPANY OF NORTH AMERICA, Defendants, Appellees. ____________________ THE TRAVELERS INDEMNITY COMPANY and INSURANCE COMPANY OF NORTH AMERICA, Defendants, Appellants, v. MILLIPORE CORPORATION, Plaintiff, Appellee. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. George A. O'Toole, U.S. District Judge] ___________________ ____________________ Before Boudin, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Lynch, Circuit Judge. _____________ ____________________ David A. Guberman, with whom Robert J. Muldoon, Jr., Nereyda ___________________ ________________________ _______ Garcia and Sherin & Lodgen LLP were on brief, for plaintiff-appellant ______ _____________________ and cross-appellee Millipore Corporation. Paul Koepff, with whom Rosemary Boller, James Arbogast, O'Melveny ___________ _______________ ______________ _________ & Myers LLP, David Chaffin and Hare & Chaffin were on brief, for ____________ ______________ _______________ defendant-appellee and cross-appellant Century Indemnity Company, f.k.a. Insurance Company of North America. James L. Ackerman, with whom Maura D. Sullivan and Day, Berry & __________________ _________________ _____________ Howard were on brief, for defendant-appellee and cross-appellant The ______ Travelers Indemnity Company. John P. Ryan, Robert G. Eaton and Sloane & Walsh were on brief, _____________ ________________ _______________ for defendant-appellee Hartford Accident and Indemnity Company. ____________________ May 30, 1997 ____________________ LYNCH, Circuit Judge. The substantial costs of LYNCH, Circuit Judge. ______________ remediating environmental damage under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. 9601 et seq., and other _________ environmental laws have pitted businesses against their insurers in fierce disputes over who will bear these costs. That is the case here. Underlying this lawsuit is the cleanup of five hazardous waste sites, three in Massachusetts and two in New Jersey. Millipore Corporation was one of the sources of waste at the sites, and was a defendant in several actions alleging violations of federal and state environmental laws. Millipore defended these suits and incurred liability as to some of the sites. It may ultimately be responsible for contributing to the remediation costs of the other sites as well. The primary issue here is whether the district court erred in entering summary judgment for the insurers (and then denying reconsideration) on the ground that none of Millipore's CERCLA liability is covered under any of the comprehensive general liability ("CGL") policies Millipore carried during the relevant periods. In considering this question, we must address, among other things, the "pollution exclusion" provisions of the insurance policies, which preclude coverage for pollution-related claims unless the -2- 2 release of pollutants was "sudden and accidental." Based on recent developments in Massachusetts environmental insurance law, we vacate in part the grant of summary judgment. We also conclude that New Jersey law applies to claims under policies issued to a New Jersey corporation later acquired by Millipore, and that summary judgment was properly entered in favor of one of Millipore's insurers, Travelers Indemnity Company, because Millipore failed to produce evidence of an occurrence within the Travelers policy period. Finally, we hold that Millipore was entitled to summary judgment on the insurers' counterclaims for reimbursement for defense costs paid to Millipore. I. The insurance coverage issues involved in this case are best understood in context. CERCLA, which was enacted in 1980, is the primary federal statutory scheme regulating hazardous waste cleanups. Some states have enacted their own regimes as well. CERCLA imposes liability for the costs of cleaning up hazardous waste sites and for the loss of natural resources due to pollution on three categories of potentially responsible parties ("PRPs"): past and present owners and operators of hazardous waste sites, some companies that transported waste to these sites, and companies that generated waste disposed of at these sites. 42 U.S.C. 9607(a). Suit may be brought against a PRP by the federal -3- 3 government, a state, or a private party who bore cleanup costs. Jerry, Understanding Insurance Law 65, at 459-60 ____________________________ (2d ed. 1996). See generally Ostrager & Newman, Insurance ______________ _________ Coverage Disputes, 10.01, 10.02 (8th ed. 1995). _________________ CERCLA creates novel forms of liability for environmental harm. It is, in general, a strict liability regime. St. Paul Fire & Marine Ins. Co. v. Warwick Dyeing ________________________________ ______________ Corp., 26 F.3d 1195, 1197-98 (1st Cir. 1994). The CERCLA _____ cost allocation scheme may operate retroactively as well: a PRP may be held responsible for actions taken before CERCLA was enacted and before the PRP was aware that its actions might lead to environmental liability. Jerry, supra, 65, _____ at 459-60. CERCLA allows joint and several liability when specific damage cannot be attributed to particular PRPs, which is often the case at hazardous waste sites. Id. 65, ___ at 460.1 Faced with environmental liability, companies began turning to their third-party liability insurance carriers for coverage under CGL policies. Comment, The 1970 Pollution ___________________ Exclusion in Comprehensive General Liability Policies, 24 ________________________________________________________ Duq. L. Rev. 1083, 1083 (1996). See generally Ballard & _____________ Manus, Clearing Muddy Waters: Anatomy of the Comprehensive ______________________________________________________ General Liability Pollution Exclusion, 75 Cornell L. Rev. 610 _____________________________________  ____________________ 1. CERCLA does, however, create a right of contribution. Id. ___ -4- 4 (1990). CGL policies are usually occurrence policies that protect insureds against most types of risk and are available for nearly all types of business ventures. Note, The "Sudden ___________ and Accidental" Exception to the Pollution Exclusion Clause _____________________________________________________________ in Comprehensive General Liability Insurance Policies, 45 ________________________________________________________ Vand. L. Rev. 161, 163-65 (1992). Since 1970, the standard CGL policy has contained a pollution exclusion clause barring coverage for pollution- related damage which should reasonably have been foreseen. Id. at 167; see also Greenlaw, The CGL Policy and the ___ ________ _________________________ Pollution Exclusion Clause, 23 Colum. J.L. & Soc. Probs. 233, __________________________ 240-41 (1990). The provision in general use from 1970 until 1985 excludes coverage for: bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water . . . . Note, supra, at 167. However, the pollution exclusion clause _____ generally "does not apply if such discharge, dispersal, release or escape is sudden or accidental." Id.2 ___  ____________________ 2. Beginning in 1970, the pollution exclusion clause was included in CGL policies as a mandatory endorsement, and in 1973, the clause was inserted into the body of the policy. Id. In 1986, the insurance industry replaced the 1970 __ pollution exclusion clause with an "absolute pollution exclusion." Jerry, supra, 65, at 468. _____ -5- 5 Based on the language of their CGL policies, insurers developed a three-step process for determining whether environmental liability was covered: "(1) did an 'occurrence' occur? . . . If so, (2) does the pollution exclusion apply, i.e., was the injury or damage caused by one of the named materials in connection with one of the four events ('discharge,' etc.) in the exclusion? . . . If so, (3) does the exception to the exclusion apply, i.e., was the event 'sudden and accidental'?" Jerry, supra, 65, at 463- _____ 64. The insurers often argued that claims based on CERCLA liability were precluded from coverage due to the pollution exclusion clause.3 As a result, the meaning of the exception to the pollution clause, and particularly the definition of the term "sudden and accidental," has been hotly contested. II. Against this backdrop, the facts are recited in the light most favorable to Millipore, the party against whom summary judgment was granted. Soileau v. Guilford of Maine, _______ __________________ Inc., 105 F.3d 12, 13 (1st Cir. 1997). ____  ____________________ 3. Commentators have suggested that insurers were ill- equipped to deal with claims based on CERCLA liability. The insurance industry did not foresee the enactment of CERCLA's retroactive strict liability regime; accordingly, insurers did not allocate financial resources for CERCLA claims. Note, supra, at 174-75. The problem, however, was not merely _____ CERCLA's retroactivity. The risk of liability under CERCLA is difficult to ascertain because environmental damage often does not become evident until many years after the end of a policy period. Id. at 175; cf. United States v. Charter ___ ___ _____________ _______ Int'l Oil Co., 83 F.3d 510, 516 (1st Cir. 1996). _____________ -6- 6 Millipore is a Massachusetts corporation primarily engaged in manufacturing products and providing services for the analysis and purification of liquids. Millipore has its corporate headquarters as well as a manufacturing facility in Bedford, Massachusetts, with other Massachusetts manufacturing facilities in Milford and Taunton. Millipore disposed of its manufacturing wastes at several different sites in Massachusetts, including the Silresim Waste Reclamation and Disposal Facility in Lowell, the Charles George Landfill in Tyngsboro, and the Re-Solve Waste Reclamation and Disposal Facility in North Dartmouth. Between December 1975 and March 1982, Millipore owned the Worthington Biochemical Corporation, located in Freehold, New Jersey, which produced research enzymes and related chemicals. The Worthington manufacturing process involved the use of substances defined as hazardous, including trichloroethylene and freons. Worthington disposed of much of its waste materials at the Lone Pine Landfill in Freehold. All four of these sites where Millipore and Worthington disposed of their wastes have a history of contaminating neighboring land and water. These troubled sites share numerous similarities involving poor design and sloppy operations. At the Silresim site, chemicals dumped into the disposal pit regularly seeped through the concrete -7- 7 lining of the pit into the ground. In 1973, the Commonwealth of Massachusetts required the operators of the site to find a solution to the problem of contaminated runoff. The landfill operators failed to do so, and also committed numerous violations of state regulations between 1973 and 1975. The Commonwealth made continued operation of the facility contingent upon regulatory compliance. The operators filed for bankruptcy, leading to the revocation of their operating permit in 1977. They abandoned the site later that year. Raging chemical fires swept the site in October 1977, August 1978, and again in April 1983. In 1983, Millipore received notification from the EPA that it was a PRP with respect to the Silresim site. Later that year, in December, Massachusetts initiated a legal action in federal court under CERCLA and various state environmental laws. See Commonwealth v. Pace, No. 83-3883-G ___ ____________ ____ (complaint filed in District of Massachusetts). It sought to recover cleanup costs from more than 200 companies that had used the Silresim site, including Millipore and Waters Associates, which Millipore had purchased in 1980. In December 1983, Millipore was also named as a defendant in a similar case brought by the federal government. United ______ States v. General Chem. Corp., No. 92-10923-T (complaint _______________________________ filed in District of Massachusetts). Shortly thereafter, -8- 8 Millipore and others paid the Commonwealth $2 million in settlement,andenteredinto aconsentdecreeinthe federalaction.4 The operators of the Charles George Landfill also committed numerous infractions of state environmental regulations. During inspections of the landfill in 1971 and 1975, the Commonwealth discovered leachate5 emanating from the landfill. By September 1976, leachate had contaminated three of the four groundwater basins at the site, and the surrounding wetlands were polluted by runoff from the facility. The situation was exacerbated when, on June 12, 1980, a fire broke out and burned until July 9. Millions of gallons of water were poured onto the landfill to extinguish the fire, generating toxic leachate and causing the water table to rise temporarily. In June 1983, the Commonwealth filed suit in state court to bring landfill operations into compliance with state law. The landfill was ultimately closed by court order later in 1983. The United States and the Commonwealth filed separate suits in 1985 against the Charles George Trucking Company, an owner-operator of the landfill, and others. The  ____________________ 4. Other parties have engaged in litigation involving this site as well. Indeed, one of the two cases recently decided by the Supreme Judicial Court clarifying the scope of the pollution exclusion under Massachusetts law involved the Silresim site. See Nashua Corp. v. First State Ins. Co., 648 ___ ____________ ____________________ N.E.2d 1272 (Mass. 1995). The case is discussed below. 5. Leachate consists of liquid byproducts of the natural decomposition process of trash in a landfill environment. -9- 9 complaints alleged violation of CERCLA and other federal and state laws, and sought, among other things, past and future costs of cleaning up the landfill. In 1986, the EPA notified Millipore that it was a PRP with respect to the Charles George site, and in 1989 Millipore was added as a defendant in two consolidated cases in the District of Massachusetts entitled United States v. Charles George Trucking Co., No. ______________ ____________________________ 85-2463-WD, and Commonwealth v. Charles George Trucking Co., ____________ ____________________________ No. 85-2714. A consent decree was ultimately entered into, and was upheld in United States v. Charles George Trucking _____________ ________________________ Co., 34 F.3d 1081 (1st Cir. 1994).6 ___ The Re-Solve site operated as a waste reclamation facility from 1956 to 1980 and handled a variety of hazardous substances. In October 1958, an explosive blaze destroyed much of the facility. It eventually re-opened, but from the early 1970's on, the Massachusetts Department of Environmental Quality Engineering (DEQE) (now the Department of Environmental Protection) was actively involved in monitoring the site. The EPA also eventually began an investigation. The site was a significant source of  ____________________ 6. The Charles George site has been at the center of a great deal of environmental litigation, both in federal and state court. See, e.g., United States v. Charles George Trucking _________ _____________ _______________________ Co., 823 F.2d 685 (1st Cir. 1987); Hussey Plastics Co. v. ___ ____________________ Continental Cas. Co., No. 90-13104-WD (D. Mass. Jun. 17, _____________________ 1993); Landauer Inc. v. Liberty Mut. Ins. Co., 628 N.E.2d _____________ _______________________ 1300 (Mass. App. Ct. 1994); Roche Bros. Barrell & Drum Co. v. ______________________________ Employers Fire Ins. Co., No. 91-6120 (Mass. Super. Ct. Jan. ________________________ 13, 1994). -10- 10 pollution. The sides of the waste lagoons at the site were not effectively sealed, which allowed pollutants to seep out. In addition, rain routinely caused the lagoons to overflow into the neighboring wetlands. Millipore was named a PRP, and the United States filed a CERCLA action to recover the costs of cleaning up the site, naming as defendants some 225 companies, including Millipore, which had sent waste to the facility. In 1988, Millipore entered into a consent decree.7 At the Lone Pine Landfill in New Jersey, rain regularly caused contaminated runoff to drain directly into the nearby Marasquan River. Toxic waste was buried in unlined pits, which allowed seepage into the surrounding soil. In addition, decomposing garbage routinely caused fires and even explosions. After a particularly harmful chemical fire in 1978, New Jersey environmental officials issued an administrative order to mitigate the damage. After non-compliance with the order, the landfill was ordered closed the following year. Millipore and Worthington were each designated as a PRP, in 1985 and 1990 respectively. In 1989, Millipore and the EPA entered into a consent decree  ____________________ 7. Other litigation involving this site included Hazen Paper ___________ Co. v. United States Fidelity & Guaranty Co., 555 N.E.2d 576 ___ _____________________________________ (Mass. 1990) and General Chemical v. First State Ins. Co., ________________ _____________________ No. 90-5855 (Mass. Super. Ct. Sept. 18, 1992). In addition, Highlands Insurance Co. v. Aerovox Inc., 676 N.E.2d 801 _________________________ _____________ (Mass. 1997), the second of the two recent SJC cases explaining the scope of the pollution exclusion clause under Massachusetts law, concerned the Re-Solve site. Aerovox is _______ discussed later in this opinion. -11- 11 involving on-site remediation, and in 1991, Millipore and the EPA entered into a second consent decree involving off-site remediation. There were also environmental problems at the Worthington plant itself. In 1976 or 1977, a freeze drier line at the plant ruptured, causing no more than 60 gallons of trichloroethylene to be released into drains leading to an on-site wastewater treatment facility. From there, the trichloroethylene evidently made its way into the soil and groundwater and migrated off site. Millipore sold Worthington's assets in 1982 to Flow General, which in 1983 sold the assets to Cooper BioMedical, Inc. In 1986, Cooper performed an environmental assessment which disclosed trichloroethylene contamination. Cooper took remedial measures, and in 1990 instituted a CERCLA action against Millipore, seeking reimbursement for costs associated with the cleanup. As to each of these sites, Millipore sought coverage under its CGL policies and those of Worthington and Waters, two potentially liable subsidiaries. Where, as here, CERCLA liability arises out of a PRP's operations over the course of many years, it often implicates general liability policies issued by several different insurers. Ostrager & Newman, supra, 10.01, at 404. A Travelers Indemnity _____ Company policy issued to Millipore covered damage occurring -12- 12 between April 1975 and July 1976. A Hartford Accident and Indemnity Company policy issued to Millipore covered damage occurring between July 1976 and May 1977. Hartford also issued a general liability policy covering the period between August 1974 and May 1977 to Worthington Biochemical Corporation; Millipore purchased Worthington in 1975. And Hartford issued two one-year liability policies covering the period between January 1975 and January 1977 to Waters Associates, a Massachusetts company purchased by Millipore in 1980. Finally, Insurance Company of North America ("INA")8 issued eight general liability policies to Millipore covering the period between May 1977 and January 1986. The Hartford and INA policies contained the standard pollution clause, quoted above, generally contained in CGL policies between 1970 and 1985. The language of the pollution exclusion provision in the Travelers policy is somewhat different in ways we need not address at this juncture.9  ____________________ 8. Century Indemnity is the successor to INA, but in this opinion we refer to the company as INA. 9. The Travelers policy states that the insurance does not apply: to bodily injury or property damage arising out of _____________ _______________ any emission, discharge, seepage, release or escape of any liquid, solid, gaseous or thermal waste or pollutant (i) if such emission, discharge, seepage, release or escape is either expected or -13- 13 Millipore sent notice to the insurers regarding the Silresim site in 1983, the Re-Solve site in 1984, the Charles George and Lone Pine sites in 1989, and the Cooper site in 1990. The insurers responded that they planned to investigate whether Millipore's claims were covered under its CGL policies. In September 1990, INA acknowledged receipt of Millipore's notice of loss for the Cooper facility (formerly the Worthington plant) and paid Millipore a share of the defense costs in the underlying litigation, but expressly reserved all rights under the policy.10 Millipore and its insurers then disagreed about payment of the costs incurred by Millipore in litigating the underlying action involving the Charles George site. After lengthy negotiations, they entered into an interim agreement in January 1993, under which the insurers would pay the defense costs but reserved the right to seek reimbursement if it was later determined  ____________________ intended from the standpoint of any insured or _______ any person or organization for whose acts or omissions any insured is liable, or _______ (ii) resulting from or contributed to by any condition in violation of or non-compliance with any governmental rule, regulation or law applicable thereto . . . . 10. INA forwarded $3,682 to Millipore to pay for its share of the cost of defending the suit involving the Cooper facility; the payment was accompanied by a letter reserving the right to reimbursement. -14- 14 that they had no duty to defend or indemnify Millipore.11 Apparently, the insurers paid no defense costs relating to the other three sites. Millipore brought suit against the insurers in five separate federal court actions, one for each site, seeking the full costs of defending the underlying actions, indemnification for its liability, and damages for unfair and deceptive insurance practices. All three insurers were named as defendants in the cases involving the Silresim and Charles George sites. INA and Hartford were the named defendants in the cases involving the Lone Pine and Cooper sites, while INA was the only defendant named in the case involving the Re- Solve site. Otherwise, the pleadings in all five cases are substantially identical.12 The insurers responded that the pollution exclusion provisions in the insurance policies defeated coverage and counterclaimed for reimbursement of the defense costs already paid to Millipore for the Charles George and Cooper sites.  ____________________ 11. Under this agreement, INA sent $115,192.10 to Millipore for its share of Millipore's defense costs, along with a letter reserving the right to reimbursement. INA had previously sent $40,844.15 Travelers paid Millipore a total of $97,922.42 for defense fees; accompanying each payment were letters in which Travelers specifically reserved the right to seek reimbursement. 12. In each complaint, Count I asks for declaratory judgment, Count II asserts claims under Mass. Gen. Laws chs. 93A and 176D, and Count III alleges breach of contract. -15- 15 The cases were consolidated before Judge Rya Zobel in the District of Massachusetts. In April 1994, following the close of extensive discovery, the insurers moved for partial summary judgment, seeking dismissal of Millipore's claims for declaratory relief. Judge Zobel granted the insurers' motion in March 1995. She first rejected Millipore's argument that New Jersey substantive law should apply to the sites in New Jersey. She noted that "[t]he Massachusetts Supreme Judicial Court has articulated a clear preference for the law of one state to interpret multistate comprehensive general liability policies," and reasoned that, "[a]s the place of plaintiff's incorporation and its principal place of business, Massachusetts has the most significant interest in this lawsuit." Judge Zobel also agreed with the insurers' argument that the pollution exclusion clauses preclude coverage. She stated that "a survey of the current caselaw suggests that it is the initial release, not subsequent leakage or damage from _______ that release which determines the issue." She went on to conclude that "the initial releases of pollutants into the landfills . . . do not fall within the meaning of 'sudden and accidental' as defined in the caselaw," because Millipore's "waste disposal practices were a routine aspect of business activity." The case subsequently was transferred to Judge -16- 16 George O'Toole when Judge Zobel became head of the Federal Judicial Center. Millipore moved for reconsideration on May 5, 1995 in light of new Massachusetts caselaw. On May 2, 1995, the Supreme Judicial Court handed down Nashua Corp. v. First _____________ _____ State Insurance Co., 648 N.E.2d 1272 (Mass. 1995), construing ___________________ a pollution exclusion clause in a case involving an insurance dispute between another company that disposed of waste at the Silresim facility and its liability insurer. Nashua Corp. ____________ held that, notwithstanding the history of routine polluting activities by the operator of the Silresim site, the evidence presented of a fire and subsequent explosion at Silresim defeated the insurer's motion for summary judgment based on the pollution exclusion. Id. at 1275-76. The court reasoned ___ that the fire and explosion caused the sudden and accidental release of pollutants into the environment, thus placing the resulting damage into the exception to the pollution exclusion clause. Millipore argued that the same fire and explosion at Silresim placed its resulting CERCLA liability within the exception to the exclusion as well. The district court denied the motion for reconsideration in November 1995. Judge O'Toole held that Nashua Corp. did not represent a change in Massachusetts _____________ substantive law and therefore that reconsideration was not warranted. -17- 17 The insurers then moved for summary judgment on Millipore's remaining claims and on the counterclaims for reimbursement for Millipore's defense costs. The district court dismissed the breach of contract and bad faith insurance practices claims.13 However, the district court ruled against the insurers on their counterclaims, granting summary judgment in favor of Millipore, on the theory that the insurers' duty to defend is more expansive than their duty to indemnify. The court reasoned that a finding that an insurer is not contractually obligated to indemnify an insured does not necessarily relieve the insurer of its duty to shoulder the burden of defense, concluding that the insurers incurred the defense costs in fulfilling their contractual obligations and were thus not entitled to reimbursement. Millipore now appeals, arguing that New Jersey law governs the two New Jersey sites, and that under Nashua ______ Corp., the evidence that fires and other accidental events _____ caused the sudden and accidental release of pollutants created a genuine issue of material fact, making a grant of summary judgment inappropriate. INA and Travelers (but not Hartford) cross-appeal from the district court's entry of  ____________________ 13. The bad faith insurance practices claims were dismissed without prejudice to their reinstatement if the grant of partial summary judgment for the insurers were to be reversed; the court evidently viewed these claims as derivative of the declaratory judgment action. -18- 18 judgment for Millipore on their counterclaims for reimbursement for defense costs. III. Choice of Law _____________ The parties dispute which state's law applies as to Counts I and II,14 so we turn to Massachusetts choice of law principles. Spurlin v. Merchants Ins. Co., 57 F.3d 9, 10 _______ ___________________ (1st Cir. 1995) (forum choice of law rules govern federal courts sitting in diversity). Millipore argues that the law of New Jersey should govern the dispute involving the New Jersey sites, while the insurers contend that the law of Massachusetts should be applied to the entire case. Our review of the district court's choice of law determination is de novo. In re San Juan Dupont Plaza Hotel Fire Litig., 45 _______________________________________________ F.3d 569, 576 (1st Cir. 1995). The first step in performing a choice of law analysis is to determine whether there is a conflict between the substantive laws of the interested jurisdictions. New Jersey insurance law recognizes the doctrine of regulatory estoppel, which in this context limits the applicability of the pollution exclusion clause as a result of  ____________________ 14. Count II alleges unfair and deceptive insurance practices under Mass. Gen. Laws chs. 93A and 176D, and therefore the question is not which state's law applies, but whether plaintiff has created a genuine issue of material fact as to whether the Massachusetts statutes are applicable here. Cf. Roche v. Royal Bank of Canada, 109 F.3d 820, 829- ___ _____ ____________________ 32 (1st Cir. 1997). -19- 19 misrepresentations allegedly made by the insurance industry to insurance regulators about the purpose and scope of the clause. Under New Jersey law, the meaning of the pollution exclusion clause is limited by the insurance industry's official explanation for its 1970 revisions to the standard CGL policy. Consequently, the pollution exclusion clause is construed to "provide coverage identical with that provided under the prior occurrence-based policy, except that the clause [is] interpreted to preclude coverage in cases in which the insured intentionally discharges a known pollutant, irrespective of whether the resulting property damage was intended or expected." Morton Int'l, Inc. v. General ____________________ _______ Accident Ins. Co. of Am., 629 A.2d 831, 875 (N.J. 1993). __________________________ Within this legal framework, Millipore would be entitled to coverage for its CERCLA liability if it could prove that it never intentionally discharged a known pollutant. In contrast, the pollution exclusion clause is interpreted much more expansively under Massachusetts law. The SJC has never recognized New Jersey's doctrine of regulatory estoppel in this context, and there is no indication that Massachusetts would adopt the doctrine. Indeed, in Lumbermens Mutual Casualty Co. v. Belleville ________________________________ __________ Industries, Inc., 555 N.E.2d 568 (Mass. 1990) ("Belleville _________________ __________ I"), the SJC refused to consider the drafting history of the _ pollution exclusion clause in determining the meaning of the -20- 20 term 'sudden' in the clause. The court reasoned that the term is unambiguous and therefore that no extrinsic evidence is necessary to understand its meaning. Belleville I, 555 _____________ N.E.2d at 573; see also Polaroid Corp. v. Travelers Indem. ________ _______________ _________________ Co., 610 N.E.2d 912, 916 n.7 (Mass. 1993) (striking amici ___ curiae briefs solely devoted to discussing the drafting and regulatory history of the pollution exclusion clause). Under the Massachusetts interpretation of the pollution exclusion clause, Millipore would need to make a stronger showing to survive a motion for summary judgment. There is a conflict between New Jersey and Massachusetts law over the interpretation of the pollution exclusion clause. The question becomes whether the district court correctly applied Massachusetts law to the disputes involving the New Jersey sites. This determination involves two distinct analyses, one for the policies issued by Hartford and INA to Millipore and the other for the policy issued by Hartford to Worthington before it was acquired by Millipore.15  ____________________ 15. All of Millipore's potential CERCLA liability for the New Jersey sites arises out of the actions of Worthington, a wholly owned subsidiary. A Hartford policy issued to Worthington covers these two sites. INA policies issued to Millipore also provide coverage to the New Jersey sites, because these policies by their terms extended to Millipore subsidiaries. Hartford also issued a policy directly to Millipore during the relevant period. It is unclear, however, whether Millipore sought coverage for liability at the New Jersey sites under this policy as well as under the policy issued to Worthington. No Travelers policies were -21- 21 Massachusetts courts take a flexible interest-based approach to conflict of laws issues and will consider a wide variety of factors in choosing the applicable law. Cosme v. _____ Whitin Mach. Works, Inc., 632 N.E.2d 832, 834 (Mass. 1994). _________________________ These factors include those listed in the Restatement ___________ (Second) Conflict of Laws: (1) the needs of the interstate __________________________ and international system, (2) the policies of the forum, (3) the policies of other interested jurisdictions, (4) the protection of justified expectations, (5) the basic policies underlying the particular field of law, (6) certainty, predictability and uniformity of result, and (7) ease of applicability. Bushkin Assocs., Inc. v. Raytheon Co., 473 ______________________ _____________ N.E.2d 662, 669 (Mass. 1985) (citing Restatement (Second) _____________________ Conflict of Laws 6 (1971)). They also include factors _________________ proposed by conflict of laws commentators: (1) predictability, (2) maintaining interstate and international order, (3) simplifying the judicial task, (4) advancing the interests of the forum, and (5) applying the better legal rule. Bushkin Assocs., 473 N.E.2d at 670 n.7 (citing Leflar, _______________ American Conflicts Law 109, at 195 (3d ed. 1977)). The SJC ______________________ has indicated that it "feel[s] free . . . to borrow from any of the various lists to help focus . . . attention on the considerations particularly relevant to the case . . . ." Bushkin Assocs., 473 N.E.2d at 670. _______________  ____________________ involved in the suits involving the New Jersey sites. -22- 22 The polices issued by Hartford and INA to Millipore are multistate CGL policies. In addressing the choice of law issue with respect to such policies, the SJC has articulated a clear preference for looking to the law of one state to govern the interpretation of such multistate policies. United Techs. Corp. v. Liberty Mut. Ins. Co., 555 N.E.2d 224, ___________________ _____________________ 227 (Mass. 1990); W.R. Grace & Co. v. Hartford Accident & _________________ ____________________ Indem. Co., 555 N.E.2d 214, 221 (Mass. 1990). The SJC ___________ reasoned that the expectations of the parties as well as commercial realities require that the language in a single set of insurance policies should mean the same thing in every state. United Techs., 555 N.E.2d at 227 & n.10. _____________ Under Massachusetts law, one jurisdiction's rules of decision must be applied to all of the sites covered under multistate CGL policies. Here, the state with the strongest interest in seeing its substantive law applied to all of the sites is Massachusetts. Massachusetts is Millipore's state of incorporation and its principal place of business. Most of the policies were negotiated and administered in and around Boston. Three of the five sites are in Massachusetts. We affirm the district court's decision to apply Massachusetts law to the disputes involving coverage under multistate CGL policies issued directly to Millipore of liability at the New Jersey as well as at the Massachusetts sites. -23- 23 The policy Hartford issued to Worthington before it was acquired by Millipore is not, however, a multistate CGL policy and so is not necessarily governed by the choice of law rules set forth by the SJC for such policies. Instead, we look again to Massachusetts choice of law rules for guidance on the issue of what law should apply to the insurance disputes involving this policy. An important consideration is the expectation of the parties at the time the policy was issued. It is significant that Millipore only acquired Worthington after Hartford had issued the policy under which coverage is disputed. At the time the policy was issued, Worthington's principal place of business was in New Jersey, as are the covered sites. Both Worthington and Hartford would reasonably have expected New Jersey law to govern the policy. In addition, New Jersey has a strong interest in the integrity of its insurance regulatory process. In Morton, the highest court of New Jersey evinced its belief ______ that limiting the scope of the pollution exclusion clause advances that interest. Morton, 629 A.2d at 875. Morton ______ ______ also indicates that New Jersey public policy favors the protection of New Jersey insureds, id.; Worthington was such ___ an insured at the time the Hartford policy was issued. New Jersey thus has a strong interest in seeing its law applied to this controversy. -24- 24 It is true that applying New Jersey law in this instance would not advance the interest in uniformity. At first blush it may seem somewhat anomalous to have the laws of different states govern very similar CGL policies providing coverage to the same sites. However, Worthington and Millipore were unrelated entities at the time the Hartford policy was issued; the expectations of the parties and the legitimate interests of New Jersey should not be defeated by the fortuity of the subsequent purchase. We reverse the district court's decision to apply Massachusetts law to the disputes involving the policy Hartford issued to Worthington, and we hold that New Jersey law applies to that policy. Thus, as to the New Jersey sites covered under the policy Hartford issued to Worthington, we remand, without further discussion of the facts concerning the releases or the policy language, for consideration of liability on Counts I and III under New Jersey law. Travelers' Coverage Argument ____________________________ Travelers' primary argument in support of its motion for summary judgment is distinct from that of the other two insurers. This argument involves the first step in determining whether CERCLA liability is covered under a CGL policy, that is, whether there was an "occurrence" within the meaning of the policy. That determination is distinct from the determination of whether there was a sudden and -25- 25 accidental event within the meaning of the pollution exclusion clause: the focus in the former inquiry is on whether there was property damage during the policy period, while in the latter it is on the circumstances of the release. Belleville I, 555 N.E.2d at 571 (noting that ____________ failure to appreciate this distinction has led to analytical confusion). The language of the policy states that coverage is provided for damages as a result of "bodily injury or . . . property damage to which this insurance applies, caused by an occurrence." The policy limits property damage to damage occurring within the policy period. Travelers argues that there was no property damage during its policy period. The Travelers policy only insured the Silresim and Charles George sites, and only for the period lasting from April 1975 until July 1976. Travelers points out that Millipore seeks coverage for damages arising out of events taking place at the Silresim site between 1977 and 1983, and at the Charles George site in 1980. These occurrences postdated the end of the Travelers policy period, and Travelers argues that there could have been no damage during the policy period. The issue is complicated somewhat by the fact that Massachusetts has not yet ruled on the proper approach to take in determining whether there has been actual property -26- 26 damage during the policy period. This was one of the questions certified to the SJC in Belleville I, but that ____________ court declined to answer the question due to an insufficient factual record, and the issue remains open. Belleville I, _____________ 555 N.E.2d at 575 & n.9. The Belleville I court did note ____________ that there are five viable approaches: the release theory, the injury-in-fact theory, the manifestation theory, the first discovery theory, and the continuous trigger theory. Id. at 575-76. Here, we need not predict which approach ___ Massachusetts would adopt, as Millipore has not demonstrated that there were any occurrences during the Travelers policy period under any of the possible approaches. The insured bears the burden of proving coverage, see, e.g., United States Liab. Ins. Co. v. Selman, 70 F.3d __________ _____________________________ ______ 684, 688 (1st Cir. 1995), and Millipore essentially conceded at oral argument that it had not met its burden of proving that any damage occurred during the Travelers policy period. Instead, Millipore argued that it should be allowed on remand to put in additional evidence of abrupt and unexpected events, such as fires, that occurred before or during the policy period and that could have caused harm during the policy period.16 Millipore, however, had ample opportunity  ____________________ 16. Due to the retroactive strict liability nature of the CERCLA regime, a company may be responsible for damages occurring before it began shipping waste to a site. As the SJC explained in Aerovox: _______ -27- 27 to create a record, and there has been no intervening clarification of the governing law. Travelers first raised the "occurrence" argument in its answer to the complaint, putting Millipore on notice that it was contesting whether there was harm during the policy period.17 Accordingly, we affirm the grant of summary judgment in favor of Travelers. The Pollution Exclusion Clauses Under Massachusetts Law _______________________________________________________ To analyze INA and Hartford's argument, we turn to the pollution exclusion clause under Massachusetts law, particularly in light of the recently decided cases of Nashua ______ Corp. v. First State Insurance Co., 648 N.E.2d 1272 (Mass. _____ __________________________ 1995) and Highlands Insurance Co. v. Aerovox Inc., 676 N.E.2d _______________________ ____________ 801 (Mass. 1997). Nashua Corp. was decided after Judge Zobel ____________ granted summary judgment against Millipore; Aerovox while _______ this appeal was pending. Prior to Nashua Corp. and Aerovox, ____________ _______  ____________________ [Under CERCLA,] the allocation of damages is not differentiated by the time when a particular PRP sent contaminated waste to the site or by the waste of a particular PRP. Thus, the fact that [the insured] did not ship waste to [the site] before 1973, fifteen years after the fire, does not preclude the possibility that some fraction of the damages [the insured] was asked to pay resulted from the 1958 fire. Aerovox, 676 N.E.2d at 806. _______ 17. While it is true that Travelers erroneously termed this argument an affirmative defense, suggesting that it bore the burden of proof on the issue, this area of the law is sufficiently well settled that Millipore should have known that it would have to bear the burden of proving that damage occurred during the policy period. -28- 28 the SJC had issued several decisions construing pollution exclusion clauses in insurance contracts, establishing general principles. However, it was unclear under what circumstances damage due to the release of pollutants on particular occasions would be covered under the sudden and accidental exception to the pollution exclusion clause if the insured had also engaged in pollution-generating activities not subject to the exception over a longer period. The SJC had ruled that "[t]he sudden event to which the exception in the pollution exclusion clause applies concerns neither the cause of the release of a pollutant nor the damage caused by the release. It is the release of pollutants itself that must have occurred suddenly, if the exception is to apply . . . ." Belleville I, 555 N.E.2d at ____________ 571.18 The focus is therefore on the circumstances of the release. Id. ___ As to the meaning of the term "sudden" the word has a temporal element, and so the release of pollutants must be abrupt (as well as accidental) for there to be coverage. Id. ___  ____________________ 18. The SJC later clarified that the circumstances surrounding the event causing the release may be informative in determining whether the release itself was sudden and accidental. Goodman v. Aetna Cas. & Sur. Co., 593 N.E.2d _______ _______________________ 233, 235 (Mass. 1992). This court later held that, when waste is poured directly into the ground (as opposed to first being placed in a container), "the relevant discharge from which the damage arose is clearly the disposal of waste containing hazardous substances into the landfill." Warwick _______ Dyeing, 26 F.3d at 1204; cf. Patz v. St. Paul Fire & Marine ______ ___ ____ _______________________ Ins. Co., 15 F.3d 699, 703-03 (7th Cir. 1994). ________ -29- 29 at 572. The SJC further explained that a discharge continuing over an extended period of time would likely cease to be sudden. Liberty Mut. Ins. Co. v. SCA Servs., Inc., 588 _____________________ ________________ N.E.2d 1346, 1350 (Mass. 1992). With respect to the word "accidental," the SJC ruled that, even if the insured did not intend the discharge _______ of pollutants, releases of pollutants are not sudden and accidental when the insured turned the waste over to a waste processor who intentionally discharged the pollutants. Polaroid Corp., 610 N.E.2d at 915-16. This court held that, _______________ under Massachusetts law, events "not clearly beyond . . . long-range reasonable expectation[s]" cannot be considered accidental. Lumbermens Mut. Cas. Co. v. Belleville Indus., ________________________ __________________ Inc., 938 F.2d 1423, 1427 (1st Cir. 1991) (Belleville II). ____ _____________ The Belleville II court raised but declined to answer the ______________ question at the heart of this case: "When, in the case of an insured whose operations involve a likelihood of continuing polluting releases, a court might properly identify a sudden release so beyond the pale of reasonable expectability as to be considered 'accidental,' we need not decide." Id. ___ Relying on this body of caselaw, Judge Zobel sensibly concluded that the exception to the pollution exclusion clause is not applicable if the harm is caused by waste intentionally sent to a landfill. However, Nashua ______ Corp. and Aerovox, decided after her decision, make clear _____ _______ -30- 30 that the exception to the pollution exclusion clause may have some force even in the context of a "pollution-prone industry." Aerovox, 676 N.E.2d at 806 n.10. _______ In Nashua Corp., the SJC ruled that, ______________ notwithstanding a company's history of routinely delivering hazardous waste to a landfill, evidence of a subsequent unexpected and abrupt release of a significant amount of pollutants into the environment may sometimes defeat the insurer's motion for summary judgment based on the pollution exclusion clause. Nashua Corp., 648 N.E.2d at 1276. The ____________ test set forth in Nashua Corp. draws on the reasoning in _____________ Belleville II and focuses on the whether the triggering event _____________ is common or uncommon. Id. Specifically, the Nashua Corp. ___ ____________ court found that evidence of a burst tank seal at one site and a fire and subsequent explosion at another site (Silresim) created a genuine issue of material fact as to whether the relevant releases were sudden and accidental. Id. ___ The court in Aerovox reaffirmed the principles set _______ forth in Nashua Corp., explaining that the test is whether ____________ the triggering event is "so beyond the pale of reasonable expectability as to be considered 'accidental.'" Aerovox, _______ 676 N.E.2d at 806 n.10. Aerovox further held that "the _______ insured must bear the burden of proving that the -31- 31 contamination was caused by a sudden and accidental release." Id. at 805.19 ___ Aerovox focused on whether the damage resulting _______ from a release which might meet Nashua Corp.'s sudden and ____________ accidental test in fact led to any identifiable damages that were more than de minimis. After Aerovox, an insured, to _______ survive a motion for summary judgment, must "raise a factual issue as to whether the sudden and accidental release caused an appreciable amount of the damage for which it is being held liable." Aerovox, 676 N.E.2d at 806. _______ In light of these intervening cases, we think there was error in the denial of the motion for reconsideration. Nashua Corp. and Aerovox are significant decisions, raising ____________ _______ the possibility of at least partial insurance recovery where many thought, based on prior law, that no such possibility existed. Aerovox arguably requires a new level of precision _______ in proving a causal connection between a particular event and particular damages. The parties are entitled to have their arguments viewed in this new light.  ____________________ 19. Judge O'Toole apparently denied the motion for reconsideration on the premise that Judge Zobel had applied the correct legal standard but had concluded that the plaintiff's factual showing had been insufficient to defeat a motion for summary judgment. However, we understand the Zobel opinion differently, as having been issued before, and without the assistance of, Nashua Corp. and Aerovox. Judge ____________ _______ O'Toole did not have the assistance of Aerovox. _______ -32- 32 The insurers ask that we nevertheless affirm the grant of summary judgment based on the factual record which was submitted to Judge Zobel before the clarification of the law occasioned by Nashua Corp. and Aerovox. The insurers ____________ _______ rely on the fact that in Aerovox, the SJC, as a matter of _______ state law, granted summary judgment against the insured, even though the record was compiled before that parties had the benefit of the Nashua Corp. decision. The insurers argue _____________ with some merit that the affidavits submitted by Millipore relating to the three Massachusetts sites are no more precise than those found wanting by the SJC in Aerovox; they argue _______ with less merit that affidavits Millipore submitted as to the New Jersey sites suffer from similar weaknesses. We decline the insurers' invitation for two reasons. The first is that these initial judgments as to the adequacy of a record on summary judgment are better made by the trial court in the first instance. See, e.g., Vicknair __________ ________ v. Formosa Plastics Corp., 98 F.3d 837, 839 (5th Cir. 1996) ______________________ (vacating and remanding for prudential reasons in light of changed law to afford the trial court the first opportunity to apply new law to the facts of the case); Satcher v. Honda _______ _____ Motor Co., Ltd., 993 F.2d 56, 57 (5th Cir. 1993) ("The ________________ district court, with its extensive knowledge of the facts and proceedings in this case, is in a far better position than are we to address and to first apply" new caselaw.); cf. ___ -33- 33 Thomas v. American Home Prods., Inc., 117 S. Ct. 282 (1996) ______ ___________________________ (mem.) (explaining the Court's practice of vacating and remanding in light of changed state law). The second reason for remand is that we think the better, fairer outcome is to permit the parties to make new submissions, if they wish, in light of the significant intervening clarification of the law. See, e.g., Naturist Society, Inc. v. Fillyaw, 958 F.2d _________ ______________________ _______ 1515, 1524 (11th Cir. 1992) (finding it "inapproriate" to consider parties claims' without further factfinding in light of newly amended state regulations); Brinley v. Commissioner, _______ ____________ 782 F.2d 1326 (5th Cir. 1986) ("justice requires" remand to allow submission of additional evidence in light of newly announced legal standard). The district court may wish to keep the parties on a short leash as to the timing of any further submissions. We do not suggest that the parties are entitled to any more discovery: after almost six years of litigation, they should know their cases and be prepared to make their best showings. We wish to be clear. To survive the motions for summary judgment, Millipore must present specific evidence creating a genuine issue as to whether the incidents at the sites were sudden and accidental and caused more than a de minimis release of pollutants into the environment. See ___ Aerovox, 676 N.E.2d at 806. To the extent that Millipore _______ chooses to rely on expert opinions, they must be more than -34- 34 "conclusory assertion[s] about ultimate legal issues." Hayes _____ v. Douglas Dynamics, Inc., 8 F.3d 88, 92 (1st Cir. 1993). We ______________________ are "not willing to allow the reliance on a bare ultimate expert conclusion to become a free pass to trial." Id. ___ Whether this partial victory proves Pyrrhic for Millipore remains to be seen -- the costs of insurance coverage litigation may sometimes outstrip the small amount of damages that an insured may be able to prove lie outside the pollution exclusion clause. The parties may wish to consider whether their best interests lie in a solution by agreement. Reimbursement for Defense Costs _______________________________ Finally, there are the insurers' counterclaims for reimbursement for money paid to Millipore for its defense costs in the underlying Charles George and Cooper suits. INA and Travelers contend that the district court's decision to enter judgment in favor of Millipore on the counterclaims was based on the erroneous assumption that the insurers had a duty to defend Millipore until the district court issued its opinion stating that the pollution exclusion clause precluded coverage here. The insurers argue that, since they never had a duty to defend or indemnify Millipore, and since they reserved the right to reimbursement for any defense costs paid to Millipore, they are entitled to recover in full the sums they paid to Millipore. -35- 35 Under Massachusetts law, an insurer's duty to defend an insured is more expansive than its duty to indemnify. Boston Symphony Orchestra v. Commercial Union ___________________________ ________________ Ins. Co., 545 N.E.2d 1156, 1158 (Mass. 1989). The duty to ________ defend is antecedent to, and independent of, the duty to indemnify; the obligation of the insurer to defend is not determined "by reference to the facts proven at trial. Rather, the duty to defend is based on the facts alleged in the complaint . . . ." Id. ___ The test for determining whether an insurer has a duty to defend is well-established. Whether there is such a duty is decided by: matching the third-party complaint with the policy provisions: if the allegations of the complaint are 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense . . . . Liberty Mut. Ins. Co. v. SCA Servs., 588 N.E.2d 1346, 1347 ______________________ __________ (1992) (quoting Sterlite Corp. v. Continental Cas. Corp., 458 ______________ ______________________ N.E.2d 338, 340 (Mass. App. Ct. 1983)). Another way of putting the point is that there is no duty to defend if, at the time the claims were advanced, the insurer "could reasonably have concluded that no aspect of the . . . claims" fell within the scope of coverage. Polaroid Corp., 610 ______________ N.E.2d at 916. -36- 36 We agree with the district court that the complaints against Millipore involving the Charles George and Cooper sites are reasonably interpreted as stating claims covered under the INA policies. The complaints allege claims pursuant to CERCLA and other federal and state statutes arising out of Millipore's generation of hazardous wastes disposed of at the Charles George site and the spillage of trichloroethylene at the Cooper site. These events are clearly occurrences under the INA policies, and while the resulting damage is pollution related, it at least arguably falls under the exception to the pollution exclusion clause. This conclusion is a corollary of our decision to vacate the grant of summary judgment and remand to the district court. The possibility of coverage is sufficient to trigger the duty to defend. Sterlite Corp., 458 N.E.2d at 341. ______________ Travelers' counterclaim presents a more difficult question, but on balance we agree with the district court's finding that Travelers had a duty to defend Millipore in the underlying Charles George action. The amended complaints filed by the United States and the Commonwealth in the underlying Charles George action allege that between, at least 1971 and 1983, a landfill was operated at the Charles George site, and that, between at least 1973 and 1976, hazardous wastes were disposed of there. Millipore, among -37- 37 others, is alleged to have generated hazardous substances that were disposed of at the site. The Travelers policy provides coverage for the period between April 1975 and July 1976, and thus, according to the complaints of the United States and the Commonwealth, covers part of the time during which hazardous wastes were shipped to the landfill. The facts alleged in the complaint raised the possibility that some of the property damage at the Charles George site occurred within the policy period. The later determination that Millipore has not met its burden of showing an occurrence during the policy period does not negate the duty to defend, which grows out of the allegations in the complaint against the insured. Boston Symphony ________________ Orchestra, 545 N.E.2d at 1158; Nashua Corp. v. Liberty Mut. _________ ____________ ____________ Ins. Co., 1997 WL 89163 (Mass. Super. Ct. Feb. 18, 1997) _________ ("[W]here a complaint is susceptible on its face of a reading that brings the claim within the polciy, the insurer cannot rely on facts outside the complaint to justify a unilateral refusal to defend."). And the complaints are reasonably susceptible to an interpretation under which the releases of pollutants were not, in the language of the Travelers policy, "either expected or intended from the standpoint of any insured, or any person or organization for whose acts or omissions any insured is liable." -38- 38 It is true that the Travelers pollution exclusion clause also precludes coverage for damage "resulting from or contributed to by any condition in violation of or non- compliance with any governmental rule, regulation, or law applicable thereto." The government complaints refer to the Commonwealth's action against the operators of the Charles George Landfill for violations of state environmental laws and regulations, and to improper disposal of waste at the site. This raises the distinct possibility that some of the claims would be precluded from coverage on this basis. However, although the question is a close one, we do not believe that the complaints could reasonably have led Travelers to conclude that no aspect of the claims fell within the scope of coverage. See Polaroid Corp., 610 N.E.2d ___ ______________ at 916. IV. The decision of the district court is affirmed in ___________ part, reversed in part and remanded for proceedings ____ ___________________ ________ consistent with this opinion. We affirm the district court's ruling that Massachusetts law applies to all claims under the multistate CGL policies issued directly to Millipore. However, we hold that New Jersey law applies to claims brought under the policy Hartford issued to Worthington, and -39- 39 remand for consideration of those claims under New Jersey law. With respect to the claims brought under the multistate CGL policies issued directly to Millipore -- claims which involve all five sites and which are governed by Massachusetts law -- we affirm the district court's grant of summary judgment in favor of Travelers but we reverse the grant of summary judgment in favor of INA and Hartford on all three counts.20 We remand to allow the parties to submit renewed affidavits in light of the standards articulated by the SJC in Aerovox and Nashua Corp. And we affirm the _______ _____________ district court's grant of summary judgment in Millipore's favor on the insurers' counterclaims for reimbursement of defense costs.  ____________________ 20. We also reverse with respect to the claims based on the Hartford policies issued by Hartford to Waters Associates, a Massachusetts company acquired by Millipore in 1980. -40- 40