The NARRAGANSETT ELECTRIC COMPANY, Plaintiff,

v.

AMERICAN HOME ASSURANCE COMPANY, et al., Defendants.

No. 11 Civ. 8299 (PKC).

United States District Court, S.D. New York.

Feb. 1, 2013.

Order Denying Reconsideration April 1, 2013.

Andrew Arthur Ruffino, Covington & Burling LLP, New York, NY, Jay T. Smith, Michael E. Lechliter, William F. Greaney, Covington & Burling, L.L.P., Washington, DC, for Plaintiff.

Julie S. Selesnick, Marie L. Vandam, Richard W. Bryan, Timothy P. Kilgore, Jackson & Campbell, P.C., Jack B. Gordon, Joseph Lawrence Ruby, Kurt Hirsch, Martin Richard Baach, Lewis Baach PLLC, Washington, DC, Steven Gary Adams, Law Offices of Michael F. Klag, Brooklyn, NY, Guy A. Cellucci, Katten Muchin Rosenman, LLP, Matthew B. Anderson, Mendes & Mount, LLP, New York, NY, Thomas M. Going, White and Williams LLP, Philadelphia, PA, for Defendants.

## MEMORANDUM AND ORDER

CASTEL, District Judge.

Plaintiff The Narragansett Electric Company ("Narragansett") brings this action for damages and declaratory relief against defendants American Home Assurance Company ("American Home"), Century Indemnity Company ("Century"), Equitas Insurance Limited ("EIL"), and Dominion Insurance Company Ltd., Excess Insurance Company Ltd., National Casualty Company, the London & Edinburgh Insurance Company Ltd. and World Auxiliary Insurance Corp. Ltd. (collectively the "London Market Companies"). Narragansett alleges that defendants breached their contractual obligations under various insurance policies by refusing to defend and indemnify Narragansett in an environmental lawsuit (the "Commonwealth Action").

Counts I through V of the First Amended Complaint allege that Century breached its duties to defend and indemnify under one of the Century policies at issue in this action (the "Century Primary Policy") and acted in bad faith by refusing to defend Narragansett in the Commonwealth Action.[1] Century now moves to dismiss Counts I through V of the First Amended Complaint pursuant to Rule 12(b)(6), Fed. R.Civ.P., asserting that the First Amended Complaint fails to state a claim upon which relief can be granted. Narragansett filed both an opposition to Century's motion, (Docket No. 80), as well as its own motion for partial summary judgment, pursuant to Rule 56(a), Fed.R.Civ.P., as to Count I of the First Amended Complaint, which concerns Century's duty to defend. (Docket No. 75.) Century filed a cross-motion for partial summary judgment as to Counts I through V of the First Amended Complaint. (Docket No. 88.)

A principal issue presented on these motions is which jurisdiction's law applies to the Century Primary Policy. For the reasons explained, the Court concludes that Massachusetts law applies. Applying

---

1. The First Amended Complaint also alleges that Century is liable to Narragansett pursuant to several excess policies, which are not at issue in the pending motions.

Massachusetts law, Century had a duty to defend Narragansett if the allegations in the Commonwealth Action are reasonably susceptible to an interpretation that (1) there was an occurrence during the policy period and (2) a release of pollutants falls within the "sudden and accidental" exception to the Policy's pollution exclusion. The Court concludes that the allegations of the complaint in the Commonwealth Action triggered Century's duty to defend Narragansett.

Counts VI and VII of the First Amended Complaint allege that certain defendants had a duty to indemnify Narragansett under numerous excess insurance policies issued between 1945 and 1985. The London Market Companies, American Home, and EIL move to dismiss Counts VI and VII of the First Amended Complaint under Rule 12(b)(6), Fed.R.Civ. P., asserting that the First Amended Complaint fails to state a claim upon which relief can be granted because it does not plausibly allege an "occurrence" that would trigger the policies at issue. (Docket No. 65.) One of the defendant excess insurers, American Home, also joins portions of Century's motion to dismiss, (Docket No. 68), and asserts that Counts VI and VII of the First Amended Complaint fail to state a claim upon which relief can be granted for the additional reason that the American Home policies contain a pollution exclusion. (Docket No. 71.) The Court concludes that Counts VI and VII plausibly allege an occurrence that is not excluded.

## I. BACKGROUND

### A. Parties and Policies

Narragansett is a Rhode Island public utility company with its principal place of

business in Rhode Island. (Lechliter Decl. Ex. 3.)[2] Narragansett is the successor by merger to Blackstone Valley Electric Company ("BVEC"), which itself is the successor to Blackstone Valley Gas & Electric Company ("BVG & E"). (Id. Exs. 3, 4.) In 1985, BVEC's principal place of business was Lincoln, Rhode Island. (Id. Exs. 5, 6.) From 1936 until 2000, BVG & E and later BVEC were wholly-owned subsidiaries of Eastern Utilities Associates ("EUA"), a voluntary association in Massachusetts with its principal place of business in Boston. (Docket No. 95 at 4; see also Going Aff. Ex. 1 at D–264783, D–264786; id. Ex. 2 at D–208179.) In 2000, BVEC merged with Narragansett. (Lechliter Decl. Ex. 3.)

### 1. The Century Primary Policy

Defendant Century is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. (Id. Ex. 7 ¶ 4.) Century is successor to Insurance Company of North America ("ICNA"). (Id.)

In or about 1985, ICNA issued a general liability insurance policy, the Century Primary Policy, to EUA and certain subsidiaries, including BVEC, for the policy period January 1, 1985 through January 1, 1986. (Id. Ex. 1.) The Century Primary Policy identifies the "Named Insured" as:

> Eastern Utilities Associates, EUA Service Corporation[,] Blackstone Valley Electric Company, Montaup Electric Company, Eastern Edison Company, and/or any subsidiary, associated, allied, or affiliated company which is majority owned and now existing or which may hereafter appear.

**2.** Citations to the Lechliter Declaration and Going Affidavit refer to the parties' summary judgment submissions.

(*Id.* at D–264786.) Immediately below this paragraph is listed a single post office box in Boston, Massachusetts. (*Id.*) Separate premiums were calculated for each insured entity by "using a different payroll basis for each company, while applying the same 'rates.'" (Docket No. 95 at 9 (citing *id.* at D–264783).) As explained at oral argument, the size of an insured's payroll factored into the determination of its premium. (Tr. 24.)[3] The Century Primary Policy specifies that "[t]he insurance afforded applies separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the Company's liability." (Lechliter Decl. Ex. 1 at D–264780.) Accordingly, the Policy provides an "aggregate limit to indemnity." (Tr. 22.)

Each insured receives liability coverage under the Century Primary Policy, which explains that:

> [t]he Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies, caused by an occurrence and the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such . . . property damage, even if any of the allegations of the suit are groundless, false, or fraudulent . . . .

(Lechliter Decl. Ex. 1 at D–264788.) The policy thus provides liability coverage for property damage caused by an occurrence. (Docket No. 95 at 7.) The Century Primary Policy defines "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the Insured." (Lechliter Decl. Ex. 1 at D–264780.)

The Century Primary Policy also contains a pollution exclusion. (*Id.* at D–264788.) The pollution exclusion provides that the policy does not cover "bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water" unless "such discharge, dispersal, release or escape is *sudden and accidental.*" (*Id.* (emphasis added).)

As successor to ICNA, Century succeeded to ICNA's liabilities and obligations to BVEC under the Century Primary Policy. (Lechliter Decl. Ex. 7 ¶¶ 4, 7.) Narragansett now alleges that Century's predecessor was obligated to defend and indemnify Narragansett under the Century Primary Policy. To date, Century has not reimbursed Narragansett for its litigation costs and liabilities related to the Commonwealth Action. (Leone Decl. ¶¶ 3–4.)

According to Narragansett, ICNA "repeatedly and in bad faith ignored Narragansett's requests for a defense of the Commonwealth Action." (First Am. Compl. ¶ 52.) In particular, representatives of ICNA, "explicitly and in bad faith instructed the claims investigator responsible for the Commonwealth Action claim and other related claims not to contact [ICNA's] policyholder, BVEC." (*Id.*) As a result, Narragansett incurred substantial litigation costs in the Commonwealth Action. (*Id.* ¶ 53.)

---

**3.** All transcript citations refer to the corrected transcript of the oral argument held on January 17, 2013.

## 2. The Excess Policies

Narragansett asserts that defendants American Home, the London Market Companies and EIL must indemnify Narragansett for the expenses incurred in connection with the Commonwealth Action. (*Id.* ¶ 69.) Defendant American Home is a New York corporation engaged in the insurance business. (*Id.* ¶ 3.) The London Market Companies are English, Welsh and Scottish entities also engaged in the insurance business. (*Id.* ¶¶ 5, 7–10.) EIL is an English and Welsh company engaged in the insurance business.[4] (*Id.* ¶ 6.)

The insurance policies at issue include four American Home policies, which were in effect at various times between 1973 and 1985, (*id.* ¶ 20; *id.* Ex. A), as well as certain policies issued by the London Market Companies, which were in effect at various times between 1948 and 1968. (*Id.* ¶ 23; *id.* Ex. A.) EIL has obligations under the London Market excess policies, (*id.* ¶ 31), as well as several other policies in effect between 1945 and 1950.[5] (*Id.* Ex. A.)

The London Market excess policies were "marketed by the London underwriters as providing the broadest form of liability coverage available." (*See id.* ¶ 23.) Each of the excess policies at issue in the pending motions provides liability coverage for third-party property claims as long as the property damage was "caused by or gr[ew] out of" an "occurrence," (*id.* ¶¶ 21, 31),

which the policies define as "one happening or series of happenings, arising out of or due to one event taking place during the term of this contract."

On January 19, 2012, American Home and the London Market Companies filed a motion to dismiss Narragansett's original complaint on multiple grounds, including that Narragansett failed to state a claim upon which relief could be granted because it did not allege an "occurrence" during a relevant policy period. (Docket No. 34.) On March 22, 2012, the Court granted Narragansett leave to file an amended complaint, (Docket No. 60), and defendants' motions were deemed withdrawn without prejudice. American Home and the London Market Companies now move to dismiss Narragansett's First Amended Complaint for failure to state a claim because Narragansett has again failed to plead an "occurrence." (Docket No. 65.) On September 25, 2012, EIL joined this motion. (Docket No. 99.)

The four American Home excess policies at issue contain the same pollution exclusion as the Century Primary Policy. (Docket No. 71.) American Home has joined argument sections I.A and I.C of Century's motion to dismiss, asserting that Narragansett has failed to plausibly allege that American Home had a duty to indemnify for the additional reason that coverage is barred by the pollution exclusion. (*Id.*)

---

**4.** On September 12, 2012, the Court denied EIL's motion to dismiss the First Amended Complaint, which argued that Narragansett had insufficiently alleged that EIL agreed to assume certain obligations under the London Market excess policies. *Narragansett Elec. Co. v. American Home Assur. Co.*, No. 11 Civ. 8299, 2012 WL 4075171 (S.D.N.Y. Sept. 12, 2012).

**5.** The pre–1950 policies at issue in this action are lost. (Docket No. 66 at 2 n. 1.) A trial

was held on this issue in November 2010 as part of the *OneBeacon Am. Ins. Co. v. Narragansett Elec. Co.*, Suffolk County Superior Court, Mass., 05–3086–BLS–I, litigation. The "verdict was limited to the material terms expressly identified by the [c]ourt (they matched the terms of the known 1950–1968 policies)." (*Id.*) The London Market Companies have reserved their rights concerning objections to the jury charge and verdict. (*Id.*)

B. The Commonwealth Action

On July 13, 1987, the Commonwealth of Massachusetts filed a complaint (the "Commonwealth Complaint") in the United States District Court for the District of Massachusetts, No. 87–1799 T, claiming that Narragansett's predecessor, BVEC, and other defendants were strictly liable for property damage caused by the release of hazardous substances at the Mendon Road site. (Lechliter Decl. Ex. 2 ("Commonwealth Compl.").) The Commonwealth Complaint alleged, *inter alia*, that:

- "The disposal of hazardous materials at and around the [Mendon Road site] has presented and continues to present a grave threat to the health, safety, and welfare of the Commonwealth's residents . . . ." (*Id.* ¶ 2.)

- "The Mendon Road site consists of approximately twenty-four acres of land located at and around 499 and 501 Mendon Road in the City of Attleboro, Massachusetts." (*Id.* ¶ 15.)

- "In July 1984, the Department received a report from the City of Attleboro health department that blue sludge-like material was discovered during the City's inspection of a domestic sewerage system at the residence of Stephen M. Brunelle and Sylvie M. Brunelle at 501 Mendon Road." (*Id.* ¶ 22.)

- "In July 1984, the Department . . . took samples from the soil and groundwater. The samples revealed the presence of ferric ferrocyanide in concentrations up to 7,500 parts per million in the sludge and soil at 501 Mendon Road." (*Id.* ¶ 23.)

- "The presence of ferric ferrocyanide and other chemical compounds in the soil and groundwater at the site has posed and continues to pose a threat to human health and the environment." (*Id.* ¶ 28.)

- "At various times from the 1930s through the 1970s, the . . . [Courtois defendants] . . . conducted sand and gravel operations at the site by excavating and removing surface soils. The Courtois defendants filled in certain areas of the site after they were excavated." (*Id.* ¶ 30.)

- "Courtois Sand & Gravel Company deposited sludge contaminated with ferric ferrocyanide on at least those portions of the site identified as Lots 1, A, 1C, 2A, and 2. This sludge was deposited in layers ranging in thickness from two tenths of one foot to eight feet. Some of the sludge was covered with a shallow layer of clean soil." (*Id.* ¶ 32.)

- "In or about 1984, Maurice C. Brunelle excavated a portion of Lot 1C for the purpose of constructing a house foundation. During this excavation, Maurice C. Brunelle uncovered blue sludge that was contaminated with chemical substances." "While conducting excavation on Lot 1C in or about 1984, Maurice C. Brunelle caused hazardous chemicals to be released to the environment." (*Id.* ¶¶ 37–38.)

- "For each year between the 1890s and the 1950s, BVG & E generated thousands of tons of by-products and wastes as a result of the production of manufactured gas at [its] . . . facility. These by-products and wastes include coal tars and spent wood chips contaminated with ferric ferrocyanide, iron oxides, and naphthalene." (*Id.* ¶ 42.)

- "Between approximately 1930 and 1945, BVG & E contracted with the [Courtois Sand & Gravel Company] for disposal at the site of by-products and wastes generated by the gas manufactured process at [its] . . . facility."

"At some time between 1930 and 1945, the [Courtois Sand & Gravel Company] transported by-products and wastes from the . . . facility to the site and deposited the materials at the site." (*Id.* ¶¶ 43–44.)

The Commonwealth claimed that there were and continued to be actual and threatened releases of hazardous substances from and at the Mendon Road site, (*id.* ¶ 58), and thus, sought reimbursement for the cost of remediation. (*Id.* ¶ 1.) On October 12, 2006, the United States District Court for the District of Massachusetts entered a final consent decree, which resolved the dispute as to Narragansett's liability. (Lechliter Decl. Ex. 8.)

Narragansett contends that property damage occurred at the Mendon Road site during each year between 1945 and 1986. (First Am. Compl. ¶ 36.) The property damage at the Site is alleged to have been caused by "(a) the release by dissolution and breakdown of the chemical components of waste materials during the policy period, (b) the release of contaminants due to sand and gravel quarry operations during the policy period, and/or (c) the release of contaminants due to residential construction during the policy period." (*See id.* ¶ 70.)

## II. *STANDARDS OF REVIEW*

### A. Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), Fed.R.Civ.P., "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The "factual content" offered must "allow[ ] the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Id.* Accordingly, "the plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.; see also Twombly,* 550 U.S. at 555, 127 S.Ct. 1955.

"[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (per curiam)). "Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir.2010) (quoting *Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir.2006)). "However, 'even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document.'" *Id.* (quoting *Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006)).

### B. Summary Judgment

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed.R.Civ.P. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he requirement is that there be no *genuine* issue of *material* fact." *Id.*

at 248, 106 S.Ct. 2505. Material facts are determined by the governing substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In general, the only material facts that are relevant for deciding a summary judgment motion regarding an insurer's duty to defend are the insurance policy and the factual allegations of the third-party complaint. *See, e.g., Nortek, Inc. v. Liberty Mut. Ins. Co.,* 858 F.Supp. 1231, 1238 (D.R.I.1994). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "When both sides have moved for summary judgment, 'each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'" *Law Debenture Trust Co. of New York v. Maverick Tube Corp.,* 595 F.3d 458, 468 (2d Cir.2010) (quoting *Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir.2001)).

## III. CENTURY PRIMARY POLICY

### A. Choice of Law

This action properly invokes the Court's diversity jurisdiction. 28 U.S.C. § 1332. Thus, New York State choice of law rules apply. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Schwartz v. Liberty Mut. Ins. Co.,* 539 F.3d 135, 151 (2d Cir.2008). Narragansett argues that Rhode Island law governs the Century Primary Policy. Century argues that Massachusetts law applies.[6]

"[T]he first step in any choice of law inquiry is to determine whether there is an 'actual conflict' between the laws invoked by the parties." *Harris v. Provident Life & Acc. Ins. Co.,* 310 F.3d 73, 81 (2d Cir. 2002) (citing *In re Allstate Ins. Co.,* 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993)). Here, Rhode Island and Massachusetts courts interpret the "sudden and accidental" exception to the pollution exclusion differently. Rhode Island more broadly construes "sudden and accidental" to mean unintended and unexpected. *See, e.g., Textron, Inc. v. Aetna Cas. & Sur. Co.,* 754 A.2d 742 (R.I.2000). By contrast, Massachusetts law requires a showing of temporal abruptness. *E.g., Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc.,* 407 Mass. 675, 555 N.E.2d 568, 571–72 (1990). The states also differ as to the required showing to establish a triggering "occurrence." Each party asserts that its position prevails regardless of which state's laws apply. (*See, e.g.,* Docket No. 69 at 1 n. 2; Docket No. 80 at 2; Docket No. 76 at 21–24.) The Court

6. In the memorandum of law supporting its motion to dismiss the First Amended Complaint, Century asserts that if Massachusetts law does not apply, the law of New York applies because "the other Century policies at issue in the case were issued in New York." (Docket No. 69 at 1 n. 2.) However, the other Century policies at issue in this action are not at issue in the pending motions. Notably, throughout its summary judgment papers, which consider the choice of law issue extensively, Century makes no further argument for why New York law should apply in the alternative. (Docket Nos. 89, 96.)

concludes that there is a substantial conflict between Massachusetts and Rhode Island law on relevant issues of contract interpretation.

 Where the conflicting laws of two or more states potentially apply to a contract, New York employs a "center of gravity" or "grouping of contacts" approach to determine "which State has 'the most significant relationship to the transaction and the parties.' " *Zurich Ins. Co. v. Shearson Lehman Hutton,* 84 N.Y.2d 309, 317, 618 N.Y.S.2d 609, 642 N.E.2d 1065 (1994) (quoting Restatement (Second) of Conflict of Laws § 188). In a general contract case, a court examines several factors including 1) the place of contracting; 2) the place of negotiation; 3) the place of performance; 4) the location of the subject matter; and 5) the contracting parties' places of business or domiciles. *Id.* (citing Restatement (Second) of Conflict of Laws § 188). In the specific context of liability insurance contracts, however, the applicable law is generally the "law of the state which the parties understood was to be the principal location of the insured risk ... unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties." *See id.* at 318, 618 N.Y.S.2d 609, 642 N.E.2d 1065 (citing Restatement (Second) of Conflict of Laws § 193).

Narragansett urges that *Certain Underwriters at Lloyd's, London v. Foster Wheeler Corp.,* 36 A.D.3d 17, 822 N.Y.S.2d 30 (1st Dep't 2006), *aff'd,* 9 N.Y.3d 928, 844 N.Y.S.2d 773, 876 N.E.2d 500 (2007), is the applicable New York authority for determining the principal location of the insured risk. (Docket No. 76 at 5–6.) In *Foster Wheeler,* the First Department held that when an insurance policy covers risks in multiple states, "the state of the insured's domicile should be regarded as a proxy for the principal location of the insured risk." 36 A.D.3d at 24, 822 N.Y.S.2d 30 (noting domicile is determined by principal place of business for corporate defendants (*Id.* at 25, 822 N.Y.S.2d 30.)). The Second Circuit has endorsed "disregard[ing] (or at least discount[ing]) the location of the insured risk when the risk is located in two or more states." *Maryland Cas. Co. v. Continental Cas. Co.,* 332 F.3d 145, 153 (2d Cir.2003). Several federal cases decided after the intermediate appellate court's ruling in *Foster Wheeler* have declined to read *Foster Wheeler* as imposing a bright-line rule, and instead have considered factors outlined in the Restatement in addition to the insured's domicile. *E.g., Schwartz,* 539 F.3d at 152 (not citing *Foster Wheeler* ); *Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC,* No. 08 Civ. 1316, 2009 WL 137055, at *4–5 (S.D.N.Y. Jan. 21, 2009), *aff'd,* 628 F.3d 46 (2d Cir.2010) (noting *Foster Wheeler* was an intermediary state appellate court opinion). In a subsequent case, the New York Court of Appeals expressly approved of the analysis in *Foster Wheeler. See Matter of Midland Ins. Co.,* 16 N.Y.3d 536, 544, 923 N.Y.S.2d 396, 947 N.E.2d 1174 (2011) (endorsing insured's domicile as proxy for the principal location of insured risk when a policy covers risk in multiple states). As discussed below, the Court applies the principles outlined in *Foster Wheeler* to the facts of the case and concludes that EUA, the parent of Narragansett's predecessor, is the relevant insured for purposes of determining which state's laws should apply to the policy.

The Century Primary Policy lists as the "Named Insured" multiple entities, including BVEC, the litigant-insured, which is located in Rhode Island, EUA, the then-corporate parent, located in Massachusetts, and several other EUA subsidiaries.

(Lechliter Decl. Ex. 1 at D–264786.) Neither party has identified New York case law post-*Foster Wheeler* that provides guidance where insurance policies cover multiple insureds located in multiple states.[7] *See Wausau Bus. Ins. Co. v. Horizon Admin. Servs. LLC*, 803 F.Supp.2d 209, 215–16 (E.D.N.Y.2011) (noting state cases applying *Foster Wheeler* involve policies covering a single named insured entity). Narragansett cites one case from the District of Maine for the proposition that, under Maine's choice-of-law principles, only the insured entity involved in the litigation is relevant for choice-of-law purposes. *See Auto Europe, L.L.C. v. Connecticut Indem. Co.*, No. 01–271–P–H, 2002 WL 475123, at *4 (D.Me. Mar. 28 2002), *report and recommendation adopted* May 17, 2002, *aff'd*, 321 F.3d 60 (1st Cir.2003) ("The rights and duties of the only parties involved in this action are to be determined, under Maine choice-of-law principles, by the law of the state which those parties understood to be the principal location of the insured risk with respect to the only insured involved in this action.").[8]

The Court finds little support under the New York precedents for a rule that where several affiliated corporations are named insureds, the law governing the corporate affiliate who happens to be a party to the litigation at hand is controlling. The litigant-insured's domicile, which may vary from the domicile of other affiliates, may have an insubstantial connection to the placement of coverage. Applying the litigant-insured's domicile undermines the ability of the insured and insurer to read and understand a policy prior to an event giving rise to litigation. In short, *Foster Wheeler* teaches that the domicile of the insured controls the choice of law determination. *See* 36 A.D.3d at 27, 822 N.Y.S.2d 30 ("obviating the need to consider all five Restatement factors"). It does not, however, answer the question of whether, in the case of multiple insureds covered by the same policy, the domicile of the insured-litigant or the domicile of the insured with the greatest nexus to the placement of coverage is controlling.

Also, applying the litigant-insured's domicile may result in the laws of more than one state applying to the same insurance policy because two or more corporate affiliates with differing domiciles may become party to litigation either simultaneously or successively. Having multiple states' laws apply to a single policy is inconsistent with the approach preferred by New York courts. *See Maryland Cas. Co.*, 332 F.3d at 154 & n. 8 (noting a "dearth of New York cases applying the laws of more than one state to an insurance policy"); *see also Wausau*, 803 F.Supp.2d at 215 (Reyes, MJ.) (expressing concern that applying the law of each named insured's domicile would result in a "single policy governed by the laws of different states—precisely what *Foster Wheeler* sought to avoid"); *FC Bruckner*

---

7. *FC Bruckner Assocs., L.P. v. Fireman's Fund Ins. Co.*, 95 A.D.3d 556, 556–57, 944 N.Y.S.2d 84 (1st Dep't 2012), considered a policy where the sole named insured was a parent company and coverage extended to unnamed subsidiaries by endorsement.

8. The First Circuit, affirming the lower court in *Auto Europe*, cited the Restatement Second's commentary, which explains that where a policy insures against risk in multiple states "the courts would be inclined to treat such a case ... as if it involved [separate] policies, each insuring an individual risk." Restatement (Second) of Conflict of Laws § 193 cmt. f. However, comment f also anticipates that such a policy would "usually" incorporate "special statutory forms of the several states involved." *Id.* Here, neither party cites comment f in its briefing nor suggests that the Century Primary Policy incorporated any state-specific statutory forms.

*Assocs., L.P. v. Fireman's Fund Ins. Co.,* 95 A.D.3d 556, 556–57, 944 N.Y.S.2d 84 (1st Dep't 2012) (considering a policy where sole named insured was the parent company and coverage extended to unnamed subsidiaries by endorsement).

The Court considers the Century Primary Policy as a whole to determine which insured entity is controlling for choice-of-law purposes. The 1985 Century Primary Policy lists EUA, BVEC's then corporate parent, and several subsidiaries, including BVEC, as the insured parties, but provides only one address: a post office box located in Boston, Massachusetts. (Lechliter Decl. Ex. 1 at D–264786.) EUA is the first named insured listed on the page. (*Id.*) Moreover, on the declarations page, the first page of the Century Primary Policy, EUA is the only insured mentioned by name. (Lechliter Decl. Ex. 1 at D–264778 (defining the Named Insured as "Eastern Utilities Associates, et al.").)

The 1985 Century Primary Policy reflects a consolidation strategy employed by the EUA corporate family beginning in the 1970s. Individual companies in the EUA corporate family had previously purchased separate insurance programs. (Going Aff. Ex. 4 at 71 (Deposition of William O'Connor).) At some point in the early 1970s, the President of EUA asked William O'Connor, an employee of the EUA Service Corporation, "to look into the consolidation of the insurance needs of all of the EUA companies to see if there weren't areas in which [they] could save some seri-

ous money." (*Id.* at 70–71.) In 1972, each EUA operating subsidiary authorized O'Brion Russell, a broker, to negotiate with insurance companies.[9] (Going Aff. Ex. 5.) The 1985 Century Primary Policy was countersigned by a representative agent of Alexander & Alexander, (Lechliter Decl. Ex. 1 at D–264778), an entity that took over O'Brion Russell at some point in time. (*See* Going Aff. Ex. 4 at 121, 124.)

Narragansett argues that policy premiums were calculated separately for each named insured because costs relating to a Rhode Island public utility could only be charged to Rhode Island ratepayers pursuant to state and federal law, citing *Rhode Island Consumers' Council v. Smith*, 113 R.I. 384, 322 A.2d 17, 25 (1974); but the same methodology applied in calculating each affiliate's policy premium. (Lechliter Decl. Ex. 1 at D–264783.) Further, a January 1985 monthly invoice from the Policy's underwriting file appears to charge EUA for the entire written premium amount.[10] (Going Aff. Ex. 8 at CEN0132570.) Finally, while "the insurance afforded applie[d] separately to each insured against whom claim [was] made[,]" Century's liability limit as to indemnity applied to the group of insureds collectively. (Lechliter Decl. Ex. 1 at D–264780.)

■ The Court concludes that the Century Primary Policy was a singular contract that provided liability coverage to the individual named insureds as members of

---

9. The Court notes that no coverage was placed with ICNA until over a decade later.

10. Narragansett disputes the authenticity of the invoice and asserts that "Century audited the entire policy premium and provided a breakdown of the premium owed by company." (Docket No. 95 at 10.) In support, Narragansett offers a 1987 letter addressed to Mr. O'Connor regarding "final audits and invoices," which the individual companies received in carbon copy. (Supp. Lechliter Decl. Ex. 1 at D–280434.) The audit report purports "to revise and replace [a] bill dated 5–27–86." (*Id.* at D–280437.) That the final audit and replacement invoice treat each affiliate separately does not preclude the possibility that earlier monthly invoices reflected an aggregate written premium amount, which suggests that EUA was most integral to the placement of coverage.

the EUA corporate family. Indeed, the "Named Insured[s]" included "any subsidiary, associated, allied, or affiliated company which is majority owned and now existing or which may hereafter appear." (*Id.* at D–264786.) Accordingly, the relevant insured party—the insured with the greatest nexus to the placement of coverage—is the corporate parent, EUA. It is undisputed that EUA's principal place of business was Boston, Massachusetts. (Docket No. 95 at 4.)

Applying the domicile test to BVEC's parent, EUA, the Court concludes that Massachusetts was the principal location of insured risk. The Court does not conclude that another state had a more significant relationship to the transaction or parties with respect to the policy issued. Thus, Massachusetts law governs the Century Primary Policy.

Narragansett argues that Rhode Island "has the most significant interest in [this] dispute" because "[t]he ultimate question to be decided on this motion is who is going to pay for Narragansett's defense costs—the Rhode Island ratepayers of Narragansett, or the insurer, Century." (Docket No. 76 at 8.) In a prior action involving different environmental sites but the same parties, the Superior Court of Massachusetts held that Rhode Island law governed because "[a]ll nine of the sites in issue [had] their situs in Rhode Island" and "Rhode Island ratepayers [had] potential economic interest at stake in all nine sites." *OneBeacon America Ins. Co. v. Narragansett Elec. Co.*, No. 053086BLS1, 23 Mass. L. Rptr. 1, 2007 WL 2429724, at *5 (Mass.Super.Ct. Aug. 15, 2007). But, in the insurance context, potentially dispositive choice of law decisions will likely have economic consequences. While these consequences are not wholly irrelevant to a New York grouping of contacts analysis, they are not controlling. *Cf. Gerling Am.*

*Ins. Co. v. Steadfast Ins. Co.*, No. 00 Civ. 7907, 2001 WL 936288, at *2 n. 6 (S.D.N.Y. Aug. 17, 2001) ("Although the [Specific] Insureds are located in Pennsylvania, this fact, although not unimportant, is simply insufficient to outweigh the contacts to New York.").

Narragansett also presses that the core concern of *Foster Wheeler* was "that different law might apply to different policies issued by the different insurers to the insured." (Tr. 13.) True, the opinion considers the objective of "minimiz[ing] the likelihood that contemporaneous policies will be deemed governed by the laws of different states." *Foster Wheeler*, 36 A.D.3d at 23, 822 N.Y.S.2d 30. This concern is relevant where the excess policy has no choice of law provision, does not follow form, *and* covers a different set of insureds than a contemporaneous policy— a set of facts that happens to arise in this particular case. This predictably uncommon factual scenario should not dictate New York's broader choice of law principles.

Even if the Court were to employ a multi-factorial "grouping of contacts" analysis here, it is doubtful the ultimate conclusion would change. *See, e.g., Maryland Cas. Co.*, 332 F.3d at 153 ("[T]he location of the insured risk carries little weight in a choice-of-law analysis where the risk is scattered throughout two or more states."). The EUA corporate family, of which the insured parties were members, was predominantly based in Massachusetts.

Narragansett asserts that, under a traditional "center of gravity" or "grouping of contacts" approach, Rhode Island was the principal location of the EUA corporate family's manufactured gas plant operations and waste output, because three of the four manufactured gas plants were located in Rhode Island, (Supp. Lechliter Decl.

header 180

Ex. 3.) However, as Century explained at oral argument, approximately 65% of the payroll, which was, in fact, used to determine the premiums for the EUA-affiliated companies, came from Massachusetts.[11] (Tr. 24; *see also* Lechliter Decl. Ex. 1 at D–264783.) Although Narragansett contested that "the parties in fact calculated risk according to the number of employees that were employed by one subsidiary or another," it did not dispute that premiums were calculated based on such payroll figures. (Tr. 25.)

Moreover, a Massachusetts corporation, Alexander & Alexander, Inc., (Supp. Lechliter Decl. Ex. 1 at D–280434), countersigned the Century Primary Policy. (Lechliter Decl. Ex. 1 at D–264778.) Alexander & Alexander corresponded with the insureds regarding changes to the policy, (*see* Supp. Lechliter Decl. Ex. 1 at D–280441), as well as audits and invoices. (*Id.* at D–280434.) A 1987 policy audit report lists Alexander & Alexander as the policy agent. (*Id.* at D–280437.)

The record suggests that Alexander & Alexander corresponded with the affiliate companies primarily through one corporate representative, Mr. O'Connor, who received mail at the same Boston post office box listed on the Century Primary Policy. (*See id.* at D–280434, D–280441.) Letters addressed to Mr. O'Connor are copied to several others including Mr. Charles Thurley, who reported to the CEO of BVEC and handled matters relating to BVEC's insurance. (Going Aff. Ex. 4 at 110–14.) While BVEC may have had direct contact with its agent or ICNA, Narragansett has not proffered substantial evidence indicating that BVEC played a significant independent role in (1) the Policy's placement or (2) subsequent amendments affecting coverage.[12] Thus, the balance of contacts also weighs in favor of applying Massachusetts law to the Century Primary Policy.

### B. Duty to Defend

■■ The "insurer's duty to defend is independent from, and broader than, its duty to indemnify," which requires proof of the facts alleged. *Metro. Prop. & Cas. Ins. Co. v. Morrison*, 460 Mass. 352, 951 N.E.2d 662, 667 (2011) (quoting *A.W. Chesterton Co. v. Mass. Insurers Insolvency Fund*, 445 Mass. 502, 838 N.E.2d 1237 (2005)). A liability insurer has a duty to defend an insured in third-party actions "if the allegations of the complaint are 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms . . . ." *Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.*, 439 Mass. 387, 788 N.E.2d 522, 530 (2003) (quoting *Continental Cas. Co. v. Gilbane Bldg. Co.*, 391 Mass. 143, 461 N.E.2d 209 (1984)). The facts alleged in the third-party complaint and those facts known to the insurer determine the scope of the insurer's duty to defend. *Id.* Accordingly, "some courts refer to the standard as the 'pleadings test.'" *Century Indem. Co. v. Liberty Mut. Ins. Co.*, 708 F.Supp.2d 202, 208 (D.R.I.2010) (applying Massachusetts law).

Indeed, the application of the pleadings test for determining the duty to defend is based on the facts as they are alleged, not the facts as they are. *See Liberty Mut. Ins. Co. v. SCA Servs. Inc.*, 412 Mass. 330, 588 N.E.2d 1346, 1349 n. 4 (1992). There

---

**11.** Payroll for the EUA Service Corporation was split between Massachusetts and Rhode Island. (Docket No. 89 at 11 n. 6; *see also* Lechliter Decl. Ex. 1 at D–264783.)

**12.** The Court notes that BVEC filed its own claims. (Going Aff. Ex. 4 at 112.) Also, a policy endorsement adding coverage for Trustees of BVEC bonds provides that liability for premiums "shall be solely a liability of [BVEC]." (Lechliter Decl. Ex. 1 at D–264798.)

may be an undoubted duty to defend, where there is only a negligible duty to indemnify. *See Century Indem. Co.*, 708 F.Supp.2d at 213.

The Court, therefore, determines whether, under Massachusetts law, the allegations in the Commonwealth Complaint are reasonably susceptible of an interpretation that (1) the resulting damage triggered coverage under the Century Primary Policy and (2) the pollution exclusion does not completely bar potential coverage.

### 1. Triggering Occurrence

■ The Century Primary Policy obligates Century to defend any "suit against the Insured seeking damages on account of . . . property damage." (Lechliter Decl. Ex. 1 at D–264788.) "Property damage" is defined as "(1) physical injury to or destruction of tangible property which occurs during the policy period . . . ." (*Id.* at D–264780.) "The contamination of soil and groundwater by the release of hazardous material involves property damage." *Hazen Paper Co. v. U.S. Fidelity & Guar. Co.*, 407 Mass. 689, 555 N.E.2d 576, 582 (1990).

■ In order to trigger coverage, the Century Primary Policy further requires that such property damage be caused by an occurrence. Under the Century Primary Policy an "occurrence" is "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the Insured." (Lechliter Decl. Ex. 1 at D–264780.) Even if an act was intentional, an "occurrence" may still be covered if "the insured does not specifically intend to cause the resulting harm or is not substantially certain that such harm will occur." *Quincy Mut. Fire Ins. Co. v. Abernathy*, 393 Mass. 81, 469 N.E.2d 797, 798–99 (1984). Here, the Commonwealth Complaint does not sug-

gest that Narragansett's predecessors knew that environmental damage at the Mendon Road site would result. The Commonwealth Action was brought under environmental statutes that impose strict liability. One claim was brought pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), a statute that imposes liability on "any person who by contract, agreement, or otherwise arranged for disposal . . . of hazardous substances owned or possessed by such person . . . ." 42 U.S.C. § 9607(a)(3).

■ law provides that the property damage need not be discovered or manifested during the policy period for there to be an "occurrence" under the policy language. *Trustees of Tufts Univ. v. Commercial Union Ins. Co.*, 415 Mass. 844, 616 N.E.2d 68, 74 (1993). Rather, the inquiry is "whether the property damage, as defined in the polic[y], 'occurred' within the policy period and within the meaning of the word 'occurrence'" *Id.* Century does not dispute that the allegations in the Commonwealth Complaint plainly suggest the possibility that damage occurred between January 1, 1985 and January 1, 1986.

### 2. Pollution Exclusion and "Sudden and Accidental" Exception

The Century Primary Policy's pollution exclusion provides that the Policy does not cover:

> bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge,

dispersal, release or escape is *sudden and accidental.*

(Lechliter Decl. Ex. 1 at D–264788 (emphasis added).) The Commonwealth Complaint alleges that Narragansett's predecessor contracted with Courtois Sand & Gravel Company to deposit its by-product waste at the Mendon Road site over a period of years between approximately 1930 and 1945. (Commonwealth Compl. ¶ 43.) Releases of hazardous materials into the environment ultimately resulted. (*Id.* ¶ 1.) Accordingly, there was, at some point, a "discharge, dispersal, release or escape" of such pollutants into the land at the Mendon Road site. The Commonwealth Complaint also alleges that "[w]hile conducting excavation ... [for a house foundation] ... in or about 1984, Maurice C. Brunelle caused hazardous chemicals to be released to the environment." (*Id.* ¶ 38.) Narragansett and Century now dispute whether the "sudden and accidental" exception to the pollution exclusion applies.

Century relies primarily on the Massachusetts Supreme Judicial Court's opinion in *SCA Services* for the proposition that "an insured's transport and disposal of wastes at a landfill or dump site is precluded by the pollution exclusion contained in the Century" Primary Policy. (Docket No. 69 at 5.)[13] In *SCA Services*, the Supreme Judicial Court construed the term "sudden" in the "sudden and accidental" exception to have a temporal element, such that "only an abrupt discharge or release of pollutants falls within the exception." 588 N.E.2d at 1349 (quoting *Lumbermens Mut. Cas. Co. v. Belleville Indus.*, 407 Mass. 675, 555 N.E.2d 568 (1990)) (rejecting "sudden" to mean unexpected). The Supreme Judicial Court determined that:

The sudden event to which the exception in the pollution exclusion clause applies

concerns neither the cause of the release of a pollutant nor the damage caused by the release. It is the release of pollutants itself that must have occurred suddenly, if the exception is to apply so as to provide coverage. The exception thus focuses on the circumstances of the release.

*Belleville Indus.*, 555 N.E.2d at 571. As to whether a discharge is accidental, the Supreme Judicial Court explained that "[i]f a third person who discharged a pollutant did so intentionally, the pollution exclusion denies coverage, even to an innocent insured, for any resulting property damage. The point of view of the insured is immaterial." *Polaroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 610 N.E.2d 912, 916 (1993).

 The court in *SCA Services* held that releases caused by crushing and emptying barrels were not sudden and accidental, even though each individual release was abrupt, because the discharge operations continued over a period of months. 588 N.E.2d at 1350. The releases in *SCA Services* resulted from a "pattern of pollution prone operations that occurred over an extended period of time," and thus, ceased to be sudden and accidental. *Nashua Corp. v. First State Ins. Co.*, 420 Mass. 196, 648 N.E.2d 1272, 1275 (1995). Thus, under Massachusetts law, releases occurring over extended periods of time as part of the insured's regular business activities are not sudden and accidental, absent additional facts.

 A release having its origins with hazardous waste intentionally deposited over a long period of time may still be accidental when it is "beyond the pale of reasonable expectability ...." *See Highlands Ins. Co. v. Aerovox Inc.*, 424 Mass.

---

**13.** In their summary judgment papers, both parties incorporate by reference portions of the arguments made in support of and opposition to Century's motion to dismiss.

226, 676 N.E.2d 801, 806 n. 10 (1997) (quoting *Lumbermens Mut. Cas. Co. v. Belleville Indus.*, 938 F.2d 1423, 1427 (1st Cir. 1991)). In *Nashua*, the plaintiff had shipped waste products to recycling facilities over the course of a decade. 648 N.E.2d at 1273. A tank seal burst releasing pollutants at one site and an explosion released pollutants at a second site. Even though the released materials had originated from the intentional shipment of waste products, the Supreme Judicial Court held that there were genuine issues of material fact as to whether the releases from the burst tank seal, and fire and explosion were sudden and accidental, because these releases did not occur as part of the plaintiff's ordinary operations. *Id.* at 1276 (reversing trial court's grant of summary judgment to insurer). Moreover, the "the uncommon nature of [those] releases tend[ed] to establish the 'sudden and accidental' character of the events." *Id.* The Supreme Judicial Court endorsed *Nashua* two years later in *Aerovox*, but granted the insurer's summary judgment motion regarding its duty to indemnify because the insured was unable to show more than a de minimis amount of the pollution resulted from the alleged "sudden and accidental" release. *Aerovox*, 676 N.E.2d at 806. The First Circuit has observed that *Nashua* and *Aerovox* "make clear that the exception to the pollution exclusion clause may have some force even in the context of a 'pollution prone industry.'" *Millipore Corp. v. Travelers Indem. Co.*, 115 F.3d 21, 33 (1st Cir.1997) (quoting *Aerovox*, 676 N.E.2d at 806 n. 10).

▮ The Commonwealth Complaint alleges a specific event that caused contamination at the Mendon Road site, which may have been a release that was both sudden and accidental: "While conducting excavation on Lot 1C in or about 1984, Maurice C. Brunelle caused hazardous chemicals to be released to the environment." (Commonwealth Compl. ¶ 38.) The Commonwealth Complaint explicitly alleges a release due to residential excavation activities, which occurred long after Narragansett's predecessor arranged for its waste to be deposited at the Mendon Road site. It is plausible and reasonable that an excavation of the type alleged would have been conducted with earth moving equipment. The release of material from such activity was potentially sudden and abrupt. Further, the Commonwealth Complaint does not suggest that this release was or should have been expected by Mr. Brunelle or his contractors. *Cf. House of Clean, Inc. v. St. Paul Fire and Marine Ins. Co., Inc.*, 775 F.Supp.2d 302, 313 (D.Mass.2011) (release of chemicals routinely stored in basement was only sudden and accidental during the first flood; pollution resulting from flooding after continued storage was no longer accidental). Like the fire or burst tank seal in *Nashua*, the residential excavation did not occur as part of the site's ordinary operations or Narragansett's predecessor's routine business practices.

The Court draws guidance from the First Circuit's opinion in *Millipore*, applying Massachusetts law. One of the environmental sites at issue in *Millipore* was a landfill, which operated between 1971 and 1983 and was damaged by a fire in 1980. "Plaintiff's expert testified that the fire and efforts to control it caused hazardous waste to leak out of the landfill into surrounding soil and water." *Millipore Corp. v. Travelers Indem. Co.*, No. 91–13060–Z, 1995 WL 170101, at *2 (D.Mass. Mar. 31, 1995). The district court held the initial releases into the landfills did not fall within the meaning of sudden and accidental, noting that "a survey of the current case law suggests that it is the *initial* release, not subsequent leakage or damage from that release which determines the issue."

*Id.* at \*4–5 (emphasis in original). The First Circuit, considering alleged releases at the several sites, held that the district court erred in denying the insured's motion for reconsideration of the denial of the duty to indemnify, explaining that the intervening Massachusetts Supreme Judicial Court cases, *Nashua* and *Aerovox*, "rais[ed] the possibility of at least partial insurance recovery where many thought, based on prior law, that no such possibility existed." *Millipore*, 115 F.3d at 34. The First Circuit affirmed the district court's determination that the insurers had a duty to defend as a "corollary of [its] decision to vacate the grant of summary judgment and remand . . . ." *Id.* at 35. This Court concludes that the First Circuit's interpretation of Massachusetts law is a good predictor of how the Massachusetts Supreme Judicial Court would rule in this case.

However implausible, the Commonwealth Complaint specifically alleges that the 1984 residential excavation "caused hazardous chemicals to be released . . . ." (Commonwealth Compl. ¶ 38.) In determining the insurer's duty to defend, the Court considers the facts as they are alleged in the third-party complaint. Moreover, the Commonwealth Complaint explains that when one of the waste products, ferric ferrocyanide, "comes into contact with air, sunlight and/or an acidic environment, toxic hydrogen cyanide gases are formed." (*Id.* ¶ 27; *cf. Millipore*, 115 F.3d at 26 & n. 5 (water poured on landfill to extinguish fire generated toxic leachate, a natural byproduct of trash decomposition).) Accordingly, the Commonwealth Complaint is reasonably susceptible to the interpretation that the residential excavation caused a separate, abrupt and unintentional release by exposing the waste products to the elements.

Century argues in its reply brief and without supporting cases that it is "not obligated to defend or indemnify Narragansett with respect to allegations brought against a third-party." (Docket No. 87 at 5.) The Century Primary Policy provides that "[t]he Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of [ (a) ] bodily injury or [ (b) ] property damage[,] to which this insurance applies, cause by an occurrence . . . ." (Lechliter Decl. Ex. 1 at D–264788.) As noted, the Commonwealth Action asserted a CERCLA claim imposing strict liability on "any person who by contract, agreement or otherwise arranged for disposal . . . of hazardous substances . . . ." 42 U.S.C. § 9607(a)(3). Although Mr. Brunelle's excavation may have been the proximate cause of the pollutant's release, Narragansett still faced the possibility of strict joint and several liability under CERCLA because its predecessor arranged for the waste's disposal. *See, e.g., U.S. v. Marisol, Inc.*, 725 F.Supp. 833, 840 (M.D.Pa. 1989) ("[T]raditional tort notions such as proximate cause are inapplicable to actions brought under § 107(a) of CERCLA.").[14] Accordingly, at the pleadings stage of the Commonwealth Action, Narragansett still plausibly faced liability under CERCLA based upon the residential excavation allegations.

"To an ordinary intelligent person reading the complaint" the Commonwealth Complaint's allegations regarding residential excavation by a third party adequately

---

14. To avoid liability, Narragansett would need to establish by a preponderance of the evidence its affirmative defense that the resulting damages were caused by "an act . . . of a third party other than an employee or agent of the defendant . . . ," 42 U.S.C. § 9607(b), which requires showing that Narragansett (a) exercised "due care" and (b) "took precautions against foreseeable acts or omissions of any such third party . . . ." *Id.*

and plausibly allege a "sudden and accidental" release event in 1984. *SCA Servs.*, 588 N.E.2d at 1350. The Commonwealth Complaint does not foreclose the potential that property damage during the Century Primary Policy period, between 1985 and 1986, arose out of this release. Therefore, under Massachusetts law, Century had a duty to defend Narragansett's predecessor in the Commonwealth Action.

## C. Duty to Indemnify

As previously mentioned, the "insurer's duty to defend is independent from, and broader than, its duty to indemnify," which requires proof of the facts alleged. *Metro. Prop. & Cas. Ins. Co.*, 951 N.E.2d at 667. A conclusion "by this Court that Century does not owe a duty to defend Narragansett on the basis of the pollution exclusion, trigger, or otherwise necessarily means that Century does not owe a duty to indemnify Narragansett." (Docket No. 89 at 25.) The Court has now concluded that Century had a duty to defend Narragansett. Century's motion for partial summary judgment as to its duty to indemnify is denied.

█ Narragansett has plausibly alleged that Century had a duty to indemnify. Century's motion to dismiss the First Amended Complaint's duty to indemnify claims is denied.

## D. Bad Faith Claims

Narragansett's First Amended Complaint also asserts that Century acted in bad faith, under Rhode Island statutory law as well as the common law. The Court has concluded that Massachusetts was the principal location of insured risk under the Century Primary Policy and, therefore, that Massachusetts law governs the Policy.[15] As this Court noted in *Schwartz v. Twin City Fire Ins. Co.*, 492 F.Supp.2d 308, 329 (S.D.N.Y.2007), *aff'd*, 539 F.3d 135 (2d Cir.2008), "there is nothing either inconsistent or unduly burdensome in application of the law of [one state] to the insurer's state of mind and the law of [another state] to the interpretation of the contracts." In *Schwartz*, the Court applied the law of the place where the litigation was pending in deciding the bad faith claim. *Id.* at 327. The factual record established to date is insufficient to determine whether Rhode Island law is applicable to Narragansett's bad faith claim. The Court concludes Narragansett has otherwise plausibly alleged a bad faith claim under Rhode Island statutory law. Therefore, the motion to dismiss and motion for summary judgment as to Count III of the complaint are denied without prejudice, and the issue may be presented at the summary judgment stage, after the parties have developed an adequate factual record.

█ Pursuant to Rhode Island General Law, an insured may seek compensatory damages, punitive damages, and reasonable attorney fees, where an insurer "wrongfully and in bad faith" refused to pay a claim made under an insurance policy. R.I. Gen. Laws 1956 § 9–1–33. The obligation to act in good faith in relationships with policyholders extends to insurers doing business in the state of Rhode Island. *Skaling v. Aetna Ins. Co.*, 799 A.2d 997, 1004 (R.I.2002).[16] An insured

---

**15.** The First Amended Complaint asserts no statutory "bad faith" claim pursuant to Massachusetts law. Neither Narragansett nor the Court has identified authority supporting a bad faith claim under Massachusetts common law.

**16.** In a footnote, Century, a Pennsylvania corporation, asserts that Pennsylvania does not recognize a common law extra-contractual cause of action for bad faith and that Narragansett has not pled a cause of action under Pennsylvania's "bad faith" statute, which ap-

may prove that an insurer acted in bad faith in denying a claim by establishing that the insurer (1) "denied coverage or refused payment without a reasonable basis in fact or law for the denial," *id.* at 1010, or (2) "either intentionally or recklessly failed to properly investigate the claim or to subject the results of the investigation to a cognitive evaluation and review." *Id.* at 1011 (quoting *Thomas v. Principal Fin. Grp.*, 566 So.2d 735, 744 (Ala.1990)). Although Rhode Island law acknowledges that "an insurer is entitled to debate a claim that is fairly debatable," the "intentional failure on the part of the insurer to determine whether there is a lawful basis to deny the claim, standing alone, is bad faith." *Id.*

While the issue of coverage may have been "fairly debatable," Narragansett's First Amended Complaint alleges more than a mere denial of coverage. Rather, Narragansett alleges that ICNA repeatedly ignored Narragansett's defense requests. (First Am. Compl. ¶ 52.) Moreover, Narragansett asserts that ICNA representatives "explicitly ... instructed the claims investigator responsible for the Commonwealth Action claim and other related claims not to contact [ICNA's] policy holder, BVEC." (*Id.*)

Narragansett has plausibly alleged that Century's predecessor acted in bad faith. Moreover, the Court has determined that Century's predecessor had a duty to defend Narragansett in the Commonwealth Action. Accordingly, Century's motion to dismiss and motion for summary judgment as to Count III of the First Amended Complaint are denied.

## IV. *EXCESS POLICIES*

### A. Choice of Law

As stated, the Court has diversity jurisdiction in this action and must determine which state's laws govern the policies issued by the excess insurers, American Home, EIL and the London Market Companies. Narragansett contends that Rhode Island law applies to all excess policies at issue. (Docket No. 82 at 11.) The excess insurers' briefing does not press that any one particular state's laws govern because there is no conflict regarding the interpretation of the term "occurrence." (Tr. 5.) Otherwise, the excess insurers maintain the position, which they argued unsuccessfully in the *OneBeacon* litigation, that New York law applies to the excess policies. (Tr. 5–6.)

There is relatively little case law regarding the interpretation of "occurrence" as it is defined in the excess policies. Indeed, in the *OneBeacon* litigation, a Massachusetts state court, purporting to apply Rhode Island law, which was silent on the issue, relied significantly on New York law. The Court agrees with the excess insurers that, with regard to the interpretation of "occurrence," there is a spurious conflict. Thus, the Court need not determine which state's law governs the excess policies at this juncture.

### B. Duty to Indemnify

#### 1. Triggering Occurrence

The American Home, EIL, and London Market insurance policies provide liability coverage for third-party property damage claims for which Narragansett is liable if the property damage is "caused by or

plies only to Pennsylvania insureds. (Docket No. 69 at 15 n. 4.) However, the Rhode Island bad faith statute does not explicitly limit its applicability to in-state insurers. Moreover, Rhode Island case law indicates that fiduciary obligations apply to "[i]nsurers doing business in Rhode Island." *Skaling*, 799 A.2d at 1010. Therefore, Narragansett may prove that Century's predecessor did business in Rhode Island.

gr[ew] out of" an "occurrence" during the policy period. (First Am. Compl. ¶¶ 21, 31.) Property damage "in the form of contamination of soil and groundwater, occurred at the Mendon Road Site during each year from 1945–1986." (*Id.* ¶ 36.) The parties do not dispute that the policies define the term "occurrence" as follows:

[O]ne happening or series of happenings, arising out of or due to one event taking place during the term of this contract.

(Docket No. 66 at 4; Docket No. 82 at 3.)[17] The policies do not define the term "event." (Docket No. 82 at 10.) In order to survive a motion to dismiss, Narragansett must plausibly allege a causative event, which occurred during an applicable policy period.

The same parties litigated this same issue in a dispute involving the same insurance policies, *OneBeacon American Ins. Co. v. Narragansett Elec. Co.*, Suffolk Superior Court, Mass., 05–03086–BLS–1 (Aug. 10, 2010). Applying Rhode Island law on a motion for summary judgment, the Massachusetts court recognized that "Rhode Island ha[d] not yet ruled on the proper interpretation of this definition of occurrence." (Anderson Aff. Ex. 5 at 21.) The Massachusetts court held that, under Rhode Island law, the "policies require[d] a causative event during the policy period

other than the mere migration of contaminants from an earlier release."[18] (*Id.* at 23–24.)

■■■ Considering the opinions of numerous courts in other jurisdictions, the *OneBeacon* Court concluded that the policy language "requires a causative event other than ... property damage during the policy period."[19] (*Id.* at 21–22.) In particular, with respect to environmental claims, the court held the policy required "an actual release of pollution" in order to trigger coverage. (*Id.* at 22.) In explaining its conclusion, the court in *OneBeacon* relied significantly on the analysis in *Long Island Lighting Co. v. Allianz Underwriters Ins. Co.*, 301 A.D.2d 23, 749 N.Y.S.2d 488 (1st Dep't 2002) ("*LILCO*"). The court in *LILCO* reasoned that if migration of preexisting contaminants was an "event" under the policy terms, the "event" and the "happening" resulting from the "event" would be one and the same. *See id.* at 31–32, 749 N.Y.S.2d 488. "It would be illogical to deem the continuing migration of preexisting contaminants to be both the damage itself and the cause of the damage." *Id.; but see, e.g., Cessna Aircraft Co. v. Hartford Acc. & Indem. Co.*, 900 F.Supp. 1489, 1504 (D.Kan.1995) ("Exposure of groundwater to contami-

**17.** Narragansett acknowledges that "[t]he policies themselves are not yet in the record before the Court, but are 'integral' to Narragansett's Complaint within the meaning of *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d at 111." (Docket No. 82 at 3 n. 3.) The Court notes, however, "[t]hey do not punctuate the occurrence definition with perfect consistency" and the "word 'occurrence' may or may not be capitalized, and may or may not be followed by a comma." (*Id.*) "Further, the 1984 American Home policy places an additional comma after the phrase 'arising out of.'" (*Id.*)

**18.** Narragansett has filed its Notice of Appeal from the final judgment of the *OneBeacon*

litigation. (Docket No. 106.) On appeal Narragansett will continue to maintain the position that "mere continuing migration at a dormant site of earlier-released contaminants" is an event for purposes of triggering the American Home and London Market Companies policies. (Docket No. 82 at 11–12.)

**19.** In the *OneBeacon* litigation, another Massachusetts state court judge also granted defendants' motion for summary judgment relating to a separate environmental site because Narragansett again failed to identify an event. (Anderson Aff. Ex. 6 at 21–22.)

nants which occurs during the policy period could constitute an event within the meaning of the policy language."). The Court is persuaded by this analysis, and concludes that New York, Massachusetts, and Rhode Island would follow *LILCO*. Thus, any assertion that hazardous waste deposited at the Mendon Road site migrated to the surrounding environment during the relevant policy periods fails to allege an event under the moving defendants' policies.

Narragansett asserts that while it believes those opinions were incorrect, it still has "pled events that, even under those narrow standards, would still allow the complaint to go forward." (Tr. 69.) It alleges that property damage at the Mendon Road site grew out of several specific "occurrences taking place, in whole or in part, during the periods of the London Market Excess Policies and the American Home Excess Policies ...." (First Am. Compl. ¶ 70.) Such occurrences, the happening of migration of environmental contamination, are due to events including but not limited to "(a) the release by dissolution and breakdown of the chemical components of waste materials during the policy period, (b) the release of contaminants due to sand and gravel quarry operations during the policy period, and/or (c) the release of contaminants due to residential construction during the policy period." (*Id.*)

### i. Chemical Breakdown

Narragansett alleges that contaminants were released due to the chemical dissolution and breakdown of waste components. (*Id.* ¶ 70.) According to Narragansett, it is well-established in scientific literature that "infiltrating water can dissolve ferric ferrocyanide, a basically safe and inert substance, and break it down into chemical constituents such as cyanide that are indi-vidually hazardous ...." (Docket No. 82 at 8 n. 5.) The American Home and London Market policies "do not require that the 'event' be discrete, temporally abrupt, or a but-for as opposed to a proximate cause of the ensuing property damage." (*Id.* at 10.) Therefore, Narragansett argues the "dissolution and chemical breakdown" is an "event" under the policies at issue because the "[c]hemical breakdown of a stable compound into hazardous constituents is a process distinct from, and that necessarily occurs prior to, the migration of the dissolved constituents in groundwater." (*Id.* at 8.) Capping the buried waste with an impermeable cover is the standard method for remediating this problem. (*Id.* at 8 n. 5.)

The Court is not persuaded that Narragansett's assertions regarding chemical breakdown plausibly allege an event under the American Home and London Market policies. The policies' coverage extends to damage "arising out of or due to one event ...." (Docket No. 66 at 4; Docket No. 82 at 3.) In essence Narragansett asks the Court to characterize the breakdown of ferric ferrocyanide as multiple events or one continuous event, ultimately resulting in environmental damage. The First Amended Complaint does not allege there were specific instances of water infiltration at Mendon Road. Rather, Narragansett's chemical dissolution allegations describe an ongoing process at an otherwise inactive site. The use of the term "one event," in contrast to "one happening or a series of happenings," plainly suggests the policies' focus on discrete events. *See EnergyNorth Natural Gas, Inc. v. Associated Elec. & Gas. Ins. Serv. Ltd.*, Civ. No. C–95–591–B, 1999 U.S. Dist. LEXIS 23307 at *18–23 (D.N.H. July 1, 1999) (concluding American Home policies "do not cover property damage resulting from gradual environmental pollution").

Gradual chemical alteration from inert solid form to hazardous liquid form does not allege any new cause of damage, such as a spill or release. *See Public Serv. Elec. & Gas Co. v. Certain Underwriters at Lloyd's of London*, No. 88 Civ. 4811, 1994 U.S. Dist. LEXIS 21072, at *15–16 (D.N.J. Sept. 30, 1994) (concluding that "event" refers to the contamination itself, such as a leak or spill). Rather, the subsequent migration of the liquid pollutants caused the environmental contamination.

ii. Excavation Activities

Narragansett alleges that contaminants were released at the Mendon Road site due to Mr. Brunelle's excavation activities in 1984. (*See* First Am. Compl. ¶ 70.) It is undisputed that the waste was deposited at the Mendon Road Site prior to 1984. Still, the 1984 excavation purportedly "caused hazardous chemicals to be released to the environment." (Commonwealth Compl. ¶ 38.) Similarly, Narragansett alleges that contaminants were released during quarry operations conducted at the Mendon Road site, (First Am. Compl. ¶ 70), because from the 1930s through the 1970s, Courtois Sand & Gravel Company conducted sand and gravel operations by excavating and removing surface soils. (*Id.* at ¶ 35(a).)

█ Defendants argue that such excavation activities amount to "nothing more than thinly veiled allegations of the migration of earlier-released contaminants." (Docket No. 92 at 3.) The Court disagrees. What plaintiff alleges is that separate intervening "events," releases of hazardous substances into the environment due to excavation, caused a "happening or series of happenings," environmental damage to the soil and groundwater at the Mendon Road site. While BVG & E's waste disposal operations at the Mendon Road Site ceased before the alleged excavations occurred, releases due to on-site excavation activities are distinguishable from the passive dispersion of contaminants in other cases. Unlike the gradual migration of hazardous substances, environmental damage resulting from the excavation activities was not ongoing from the time BVG & E's manufactured gas plant operated. *Cf. LILCO*, 301 A.D.2d at 32, 749 N.Y.S.2d 488 ("Plainly, the event that caused the damage in this case was the operation of the plants ...."). Furthermore, the alleged on-site excavation events are conceptually distinct from the property damage for which Narragansett now seeks coverage. Thus, the textual argument employed in *OneBeacon* and *LILCO* to reject migration as a causative event does not obviously apply here. For these reasons, the Court concludes releases of hazardous substances during excavation operations plausibly allege events under the American Home, EIL, and London Market policies at the motion to dismiss stage.

iii. Other Event Allegations

Finally, in a footnote to its brief, Narragansett asserts that the complaint in the Commonwealth Action contains additional allegations that qualify as release events under the American Home and London Market policies. (Docket No. 82 at 8 n. 6.) These assertions, however, do not plausibly allege any additional causative events.

(a) The "appearance of blue sludge (a marker for cyanide waste) in a sewer system," (*id.*), does not, on its own, allege a causative event. It merely describes an environmental condition or damage. This does not plausibly trigger additional coverage under the policies at issue.

(b) "[T]he formation of hydrogen gases from ferric ferrocyanide wastes exposed to sunlight (presumably through excavation and quarry operations)," (*id.*), may well be the damage that resulted from an excavation event. However, as discussed herein,

the alteration of chemical compounds over an indefinite period of time does not on its own plausibly allege an event under the policies at issue. These circumstances do not plausibly trigger any additional coverage.

(c) The First Amended Complaint notes that the Commonwealth Action Complaint alleged additional disposals of "debris and waste materials" at the Mendon Road site, including sludge contaminated with ferric ferrocyanide, prior to 1975. (First Am. Compl. ¶ 34(b).) However, the Commonwealth specifically directed such allegations toward Courtois Sand & Gravel Company. Under a fair reading of the Commonwealth Complaint as a whole, Narragansett's predecessor, BVG & E, contracted with Courtois Sand & Gravel Company to dispose of its waste only during the period between approximately 1930 and 1945, years prior to the American Home and London Market policy periods.[20] (Commonwealth Compl. ¶ 43.) These allegations do not plausibly trigger additional coverage under the policies.

(d) Citing to the Commonwealth Complaint's description of a release of "blue sludge" due to the excavation activities in 1984, (id. ¶¶ 37–38), only serves to repeat a causative event alleged in the First Amended Complaint, (First Am. Compl. ¶ 70), the 1984 excavation. This allegation does not trigger additional coverage under the policies at issue.

2. Pollution Exclusion and "Sudden and Accidental" Exception

The American Home policies contain the same pollution exclusion and sudden and accidental exception as the Century Primary Policy. Defendant American Home, therefore, joined argument sections I.A and I.C of Century's memorandum of law in support of its motion to dismiss, asserting that Narragansett has failed to plausibly allege a "sudden and accidental" release that qualifies for coverage.

American Home's joinder does not address which state's laws apply to the American Home policies. (Docket No. 71.) Moreover, American Home did not join the portion of Century's briefing that addresses which state's law should govern the Century Primary Policy. American Home stated at oral argument that "to the extent there is going to be a choice of law determination made and American Home doesn't prevail on the event language in its policies, [it] would then argue that New York law should apply . . . ." (Tr. 59.)

Based on the present record, the Court is unable to determine which law governs each American Home policy. Moreover, Narragansett's arguments regarding the sudden and accidental exception to the pollution exclusion focus predominantly on Massachusetts and Rhode Island law—understandably so, as American Home has made no choice of law argument that New York law applies to its policies. The Court does not have the benefit of adequate briefing regarding whether there is an actual conflict as to this issue. Thus, the Court denies the motion to dismiss, (Docket No. 68), as to American Home.

## CONCLUSION

Plaintiff's motion for partial summary judgment (Docket No. 75) as to Count I of

---

20. EIL, joining the motion to dismiss after the completion of briefing, asserts that "[a]lthough Exhibit A to the [First Amended Complaint] alleges several policies under which EIL alone is obligated, the basis for dismissal equally applies to those policies." (Docket No. 99.) One such policy took effect in March 1945. (See First Am. Compl. Ex. A.) The Court notes that the complaint in the Commonwealth Action alleges that Courtois Sand & Gravel Company deposited BVEC's byproduct waste at the Site between approximately 1930 and 1945. The Court cannot overlook that such operations plausibly constitute an "event" under the EIL policy that covers 1945.

the First Amended Complaint is granted. Defendant's cross-motion for partial summary judgment (Docket No. 88) as to Counts I through V of the First Amended Complaint is denied. Defendant's motion to dismiss (Docket No. 68) Count I of the First Amended Complaint is moot. Defendant's motion to dismiss is otherwise denied.

Defendants' motion to dismiss (Docket No. 65) the First Amended Complaint is denied insofar as it alleges releases of hazardous substances during excavation and quarry operations at the Mendon Road site during the period between the 1930s to 1970s as well as 1984. Defendants' motion to dismiss is otherwise granted.

SO ORDERED.

### MEMORANDUM AND ORDER

Defendant Century Indemnity Company ("Century") moves for reconsideration of the Court's February 1, 2013 Memorandum and Order, which granted summary judgment to plaintiff The Narragansett Electric Company ("Narragansett") as to Century's duty to defend an environmental lawsuit brought by the Commonwealth of Massachusetts (the "Commonwealth Action"). *Narragansett Elec. Co. v. Am. Home Assur. Co.*, No. 11 Civ. 8299, 921 F.Supp.2d 166, 2013 WL 432610 (S.D.N.Y. Feb. 1, 2013). Century alternatively moves to certify the Memorandum and Order for interlocutory appeal, pursuant to 28 U.S.C. § 1292(b).

Narragansett's predecessor, a public utility company, contracted at some point between 1930 and 1945 to deposit by-product waste at the Mendon Road Site (the "Site"), a sand and gravel pit in Massachusetts. *Id.* at 172–74, at *4–5. In its Memorandum and Order, the Court considered whether the Century Primary Policy's pollution exclusion obviated Century's duty to defend Narragansett in the Commonwealth Action. The exclusion provides that the Policy does not cover "bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental." *Id.* at 181, at *13.

The Court, applying Massachusetts law, determined that "releases occurring over extended periods of time as part of the insured's regular business activities are not sudden and accidental, absent additional facts." *Id.* at 182, at *14. The Court went on to conclude, however, that the Commonwealth Complaint, (Lechliter Decl. Ex. 2 ("Commonwealth Compl.")), was "reasonably susceptible to the interpretation that [a co-defendant's subsequent] residential excavation caused a separate, abrupt and unintentional release by exposing the waste products to the elements," and thus, Century had a duty to defend. 921 F.Supp.2d at 184, 2013 WL 432610 at *16.

For the reasons discussed, the motion for reconsideration is denied, and the motion to certify the Memorandum and Order for interlocutory appeal is denied.

### DISCUSSION

#### I. Motion for Reconsideration

Local Rule 6.3 allows a party to move for reconsideration as to "matters or controlling decisions which counsel believes the Court has overlooked." A motion for reconsideration "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked-matters, in other words, that

might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp. Inc.*, 70 F.3d 255, 257 (2d Cir.1995). Reconsideration is also appropriate to "correct a clear error or prevent manifest injustice." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir.1992).

For purposes of Narragansett's duty to defend claim, the allegations in the Commonwealth Complaint must be " 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms . . . ." *Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co.*, 439 Mass. 387, 788 N.E.2d 522, 530 (Mass.2003) (quoting *Continental Cas. Co. v. Gilbane Bldg. Co.*, 391 Mass. 143, 461 N.E.2d 209 (Mass.1984)). The facts alleged in the underlying complaint and those facts known to the insurer determine the scope of the insurer's duty to defend. *Id.* The Commonwealth Complaint alleges, *inter alia*, that:

- "In or about 1984, Maurice C. Brunelle excavated a portion of Lot 1C for the purpose of constructing a house foundation. During this excavation, Maurice C. Brunelle uncovered blue sludge that was contaminated with chemical substances." (Commonwealth Compl. ¶ 37.)
- "While conducting excavation on Lot 1C in or about 1984, Maurice C. Brunelle caused hazardous chemicals to be released to the environment," (*Id.* ¶ 38.)

The Court concluded that the Commonwealth Complaint was "reasonably susceptible of an interpretation that" that a release occurred, due to the 1984 residential excavation, which was both temporally sudden and accidental in nature.[1]

Century urges that this Court should have employed the teachings of *Highlands Ins. Co. v. Aerovox, Inc.*, 424 Mass. 226, 676 N.E.2d 801 (Mass.1997), in determining its duty to defend. *Aerovox* addressed a duty to indemnify claim and held that once an insurer proves the pollution exclusion applies, the burden shifts to the insured to show 1) contamination was caused by a "sudden and accidental" release and 2) contamination from the purported release was an "appreciable and compensable proportion" of the damages for which it is liable. *Id.* at 805–07. Notably, *Aerovox* did not address the duty to defend, which historically has been assessed on the pleadings and not on the actual proof, which, at the pleadings stage, may lie beyond the control of the insured or insurer.

Relying upon *Aerovox*, Century argues that Narragansett has not met its burden of proving the exception because the Commonwealth Complaint's allegations make plain Narragansett's liability stems principally from decades of depositing its by-product waste at the Site.[2] Thus, liability based on residential excavation is *de minimis* as a matter of law. (Def. Mem. at 23.) True, the appreciable and compensa-

---

1. The Court finds unavailing Century's contention that the alleged residential excavation does not constitute an "accident" because "earth moving activities in 1984 were entirely consistent with the site's prior use as a sand and gravel pit" (also mentioned in the underlying complaint) and therefore, the residential excavation "cannot fall outside the pale of any reasonable long-range expectation." (Def. Mem. at 13.) In order to prove a defendant's duty to defend, the underlying complaint must allege facts which raise a plausible theory for coverage; the insured need not prove that it will ultimately prevail on an indemnity claim.

2. Century relies primarily on out-of-state case law in asserting the requirements set out in *Aerovox* also apply in the duty to defend context. (Def. Mem. at 22–23; Def. Reply at 6–7.)

ble requirement may be fatal to an indemnity claim. However, the alleged excavation release is explicitly mentioned in the Commonwealth Complaint. Further, the Commonwealth Complaint explains that when one of the waste by-products, ferric ferrocyanide, "comes into contact with air, sunlight and/or an acidic environment, toxic hydrogen cyanide gases are formed." (Commonwealth Compl. ¶ 27.) Thus, the Court concluded that a person of ordinary intelligence could reasonably read the Commonwealth Complaint as alleging a "sudden and accidental" release adequate to qualify for indemnity coverage under Massachusetts law. The duty to defend analysis does not require further inquiry or speculation regarding the veracity of the underlying complaint's factual allegations.

Century also maintains that, as a matter of law, the only relevant release for purposes of examining the exception to the pollution exclusion is the *initial* release of waste into the land. In its Memorandum and Order, the Court concluded that *Millipore Corp. v. Travelers Indemnity Co.*, 115 F.3d 21 (1st Cir.1997), the only case which appeared to address this issue under Massachusetts law, was "a good predictor of how the Massachusetts Supreme Judicial Court would rule...." 921 F.Supp.2d at 184, 2013 WL 432610 at *15.

This conclusion, Century asserts, is contrary to Massachusetts state case law as well as opinions nationwide, including those applying New York law.[3] (Def. Mem. at 1.) The deficiency in Century's

argument remains the same: it does not point to sources of comparable authoritative weight to *Millipore* that adequately address this issue under *Massachusetts* law.

In anticipation of oral argument, the Court ordered the parties to be prepared to address "whether Massachusetts case law addresses an insurer's duty to defend based on a 'sudden and accidental' release allegedly caused by the insured's co-defendant in the third-party action." (Docket No. 105.) At oral argument, the Court asked both parties to provide the "best cases" for their respective positions on this issue. Century now asserts, for the first time, that *Employers Ins. of Wausau v. George*, 41 Mass.App.Ct. 719, 673 N.E.2d 572 (Mass.App.Ct.1996), is "the only Massachusetts appellate decision that directly analyzes" this question. (Def. Mem. at 11.) Neither party cited *George* in its briefing. *George* states the question now before the Court but does not answer it.

The *trial* court in *George* determined the insurer did not have a duty to defend because two intervening events, a fire and spill, "arose out of" earlier nonsudden and nonaccidental waste deposits into a landfill. 673 N.E.2d at 576–77. While the intermediate appellate court noted "considerable support" for this position in the case law of other jurisdictions, in the next sentence it observed "[t]here is also authority to the contrary." *Id.* at 577 (collecting cases). Importantly, *George* acknowledged the lack of "Massachusetts appellate decision[s] directly on point" and that the

---

**3.** Century apparently argues for the application of New York law, asserting that New York and Massachusetts's interpretations of the "sudden and accidental" pollution exclusion are in accord in all material respects, and "[i]f no conflict exists, the Court is free to apply the law of the forum." (Def. Mem. at 6.) The Court thoroughly considered the choice-of-law issue in its February 1, 2013

Memorandum and Order, which noted that Century did not press its argument that New York law applies. 921 F.Supp.2d at 175 n. 6, 2013 WL 432610, at *7 n. 6. Application of New York law at this juncture would require a threshold conclusion that the states' laws do not conflict. This necessitates consideration of the parties' arguments regarding the Massachusetts case law.

"scope of *Nashua* [was] not yet clear." *Id.* Rather than rendering an "on point" decision, the appellate court affirmed the trial court because the releases at issue were not accidental.[4] *Id.* Adopting the trial court's position would have obviated the need to consider whether such releases were indeed "sudden" and "accidental," because the releases could not qualify for coverage under any set of facts. Century argues *George* "does not lose its binding effect because ... it is arguably dicta." (Def. Mem. at 13.) The problem with *George* is not that its teachings are dicta. Rather, the problem is that *George* does not foreshadow how the Massachusetts Supreme Judicial Court will rule: *George's* teachings are indeterminate. Furthermore, *Millipore*, decided the year after *George*, does not cite *George* in its analysis of a similar issue.[5]

Problematically, several of the cases Century cites consider a subsequent "discharge, dispersal, release or escape" of contaminants indistinct from the resulting property damage (e.g., the gradual migration of waste from a landfill into surrounding areas). For instance, Century cites a 2002 Massachusetts district court opinion for the proposition that "the First Circuit has held in cases involving chemical leakages from landfills that a 'dispersal, release, or escape' occurred when chemicals were first poured into a landfill rather than when they escaped the landfill and into the surrounding environment—that is to say, when the chemicals were free and uncontained and not merely when they crossed a particular property boundary." *Rev-Lyn Contracting Co. v. Am. Home Assur. Co.*, No. Civ. A. 01–11961–RWZ, 2002 WL 31427000, at *1 (D.Mass. Oct. 28, 2002) (citing *Millipore*, 115 F.3d at 32–33 & n. 18). However, the district court explained in the next sentence, "[t]o hold otherwise 'would eviscerate the important distinction established between ... damages and ... discharges.'" *Id.* (quoting *St. Paul Fire & Marine Ins. Co. v. Warwick Dyeing Corp.*, 26 F.3d 1195, 1204 (1st Cir.1994)). The present case does not implicate this important concern. The Commonwealth Complaint alleges a separate intervening release—the 1984 excavation—

---

4. The release resulting from a "huge volume of water used to extinguish [a] fire" was not accidental because the deputy fire chief was aware the water "would cause contaminants to be leached back to underground water supplies." *Id.* at 577–78. Likewise, a 1983 leachate spill was caused by an intentional act. *Id.* at 578. The court in *George* relied on extrinsic evidence in determining the insurer's duty to defend because the insured claimed these incidents, while not mentioned in the complaint, were known or readily knowable to its insurers. *See id.* at 575.

5. Century also annexes an unpublished Massachusetts district court opinion, in which the court concluded the exclusion's "arising out of" language was unambiguous. Therefore, the court precluded coverage for releases caused by a fire because such releases still "arose out of the initial discharge into the landfill. *Hussey Plastics Co., Inc. v. Continental Cas. Co.*, No. 90–13104–WD, slip. op. at 5–

8 (D. Mass. June 17, 1993) ("[T]hose courts that have interpreted the phrase 'arising out of' in the private insurance context have generally been satisfied that X 'arises out of' Y whenever there exists some significant causal connection between X and Y."). The court reasoned "[u]nder the most natural reading of the pollution exclusion clause together with its exception, the polluting event that purportedly triggers the 'sudden and accidental' exception must be the *same* event that triggers the exclusion in the first instance, not some later event in the causal chain leading to the property damage for which coverage is sought." *Id.* at 10. The First Circuit was no doubt aware of this opinion when it decided *Millipore*, which cites *Hussey Plastics* in a passing remark that a particular environmental site had been the subject of "a great deal of environmental litigation." *Millipore*, 115 F.3d at 26 n. 6. Notably, the First Circuit did not reference nor endorse *Hussey Plastics's* analysis.

distinct from the property damage it purportedly caused.

In this round of briefing, the parties also include a helpful survey of national "sudden and accidental" case law, from which Century concludes no state's highest court has applied the "sudden and accidental" exception to a release occurring *after* the initial discharge of waste without finding the "sudden and accidental" language is ambiguous.[6] Assuming this is an accurate characterization of the case law in other states, it does not speak to how the Massachusetts Supreme Judicial Court would rule.

Further, it appears that several state appellate courts that conclude the exception is unambiguous have then acknowledged the possibility of "sudden and accidental" releases after the initial depositing of waste. For instance, the court in *George,* when noting there was also authority to the contrary, cited a Minnesota appellate court, which concluded the "[t]he triggering event for purposes of determining the applicability of the pollution exclusion clause is the escape of the contaminants from the … landfill into the groundwater." *Sylvester Bros. Dev. Co. v. Great Cent. Ins. Co.,* 480 N.W.2d 368, 377 (Minn.Ct.App.1992). Likewise, a California appellate court, observing the exception was unambiguous, acknowledged the possibility of successive "sudden and accidental" releases. *Travelers Cas. & Sur. Co. v. Superior Court,* 63 Cal.App.4th 1440, 75 Cal.Rptr.2d 54, 66 (Cal.Ct.App. 1998) ("This is not to say that environmental contamination damages connected with industrial dumping are automatically barred from coverage under the sudden and accidental exception to the pollution exclusion. An intervening event may occur between the initial 'disposal of waste on the landfill and the actual damage that eventually resulted,' and that intervening event may have been sudden and accidental." (citing *Warwick,* 26 F.3d at 1204)).[7]

Finally, Century suggests that the Court's Memorandum and Order may reflect a misreading or misunderstanding of the *Millipore* opinion. (Def. Mem. at 18–19.) The First Circuit's opinion, however cursory, based its conclusion that the insurers had a duty to defend—a "corollary" to its analysis on the duty to indemnify on an alleged intervening release event at a landfill site.[8] *Millipore,* 115 F.3d at 35. For the reasons discussed herein and the February 1, 2013 Memorandum and Order, the Court adheres to its prior decision that the First Circuit's decision in *Millipore* is a good predictor of how the Massa-

---

6. According to Century, courts deeming the exception unambiguous have ascribed a temporal element to the word "sudden," while courts deeming the exception ambiguous have generally construed the phrase "sudden and accidental" more broadly to incorporate "unexpected or unintended" consequences, including subsequent migration of contaminants. The Massachusetts case law considers the pollution exclusion unambiguous and ascribes a temporal meaning to the term "sudden."

7. The Court acknowledges that other authorities in these states are open to interpretations that suggest the contrary. *E.g., State v. All-* *state Ins. Co.,* 45 Cal.4th 1008, 90 Cal.Rptr.3d 1, 201 P.3d 1147 (Cal.2009).

8. The Court also disagrees with Century's assertion that no other court has interpreted *Millipore* this way. (Def. Mem. at 16, 19.) For instance, *Standun, Inc. v. Fireman's Fund Ins. Co.,* 62 Cal.App.4th 882, 73 Cal.Rptr.2d 116 (Cal.Ct.App.1998), considering which discharge is relevant in a case involving a landfill, cites *Millipore* in a string cite with the explanatory parenthetical: "applying Massachusetts law; coverage for *subsequent* unexpected and abrupt release of a significant amount of pollutants into environment." *Id.* at 121 (emphasis added).

chusetts Supreme Judicial Court would rule on this issue.

## II. Interlocutory Appeal

Century, in the alternative, requests that the Court certify its decision for interlocutory appeal, pursuant to 28 U.S.C. § 1292(b). Section 1292(b) states:

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals ... may thereupon, in its discretion, permit an appeal to be taken from such order....

Section 1292(b) "is a rare exception to the final judgment rule that generally prohibits piecemeal appeals." *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir.1996). "The question of law certified for interlocutory appeal must refer to a pure question of law that the reviewing court could decide quickly and cleanly without having to study the record." *Stone v. Patchett*, No. 08 Civ. 5171, 2009 WL 1544650, at *2 (S.D.N.Y. June 3, 2009) (quotation marks omitted; citing *Century Pac. Inc. v. Hilton Hotels Corp.*, 574 F.Supp.2d 369 (S.D.N.Y.2008), *aff'd*, 354 Fed.Appx. 496 (2d Cir.2009)); *accord Gottwald v. Jones*, No. 11 Civ. 1432, 2011 WL 5289471, at *2 (S.D.N.Y. Nov. 3, 2011).

Because "[i]t is a basic tenet of federal law to delay appellate review until a final judgment has been entered," certification under section 1292(b) is only "reserved for those cases where an intermediate appeal may avoid protracted litigation." *Koehler*, 101 F.3d at 865–66. Certification under

section 1292(b) is to be granted sparingly. *Id.* at 866 (discussing limited number of section 1292(b) certifications); *see also Westwood Pharms., Inc. v. Nat'l Fuel Gas Distribution Corp.*, 964 F.2d 85, 88–89 (2d Cir.1992) ("urg[ing] the district courts to exercise great care in making a § 1292(b) certification" while observing that few interlocutory appeals materially advanced litigation). "The institutional efficiency of the federal court system is a chief concern underlying § 1292(b), and the Court of Appeals has repeatedly emphasized that a district court is to exercise great care in making a § 1292(b) certification." *In re Adelphia Commc'ns Corp.*, 2008 WL 5453738, at *1 (S.D.N.Y. Dec. 31, 2008) (Koeltl, J.) (quotation marks and internal citations omitted).

The Court is of the opinion that an interlocutory appeal would not materially advance the termination of this particular litigation. The threshold choice-of-law issue, which is addressed in the same February 1, 2013 Memorandum and Order, is fact-bound and therefore requires the Circuit's consideration of the underlying record. There is no compelling reason why the Court of Appeals could not effectively consider all of Century's argument on an appeal from a final judgment as to all parties.

For these reasons, certification for interlocutory appeal would be an imprudent exercise of the Court's discretion.

## CONCLUSION

Despite the breadth of Century's arguments and the volume of its briefing, the issue of Century's duty to defend comes down to a few simple propositions. Its insured was named in the Commonwealth's 1987 Complaint which alleged liability from releases of hazardous material from the Mendon Road Site, which had been deposited by the insured's contractor.

The Commonwealth, and not the insured, determined the scope of the claim which is then to be measured against the policy and its exclusion. The Commonwealth sought to impose CERCLA liability on the insured because "[w]hile conducting excavation on Lot 1C in or about 1984, Maurice C. Brunelle caused hazardous chemicals to be released to the environment." (Commonwealth Compl. ¶ 38.) A fair reading is that it alleges a release that is temporally "sudden" in that it occurred at a fixed point in 1984 and "accidental" in the sense that it was an unexpected and unintentional consequence of excavation occurring outside the insured's regular business activities and the Site's function as a sand and gravel pit. According to the Commonwealth, the hazardous material included ferric ferrocynanide which, when it "comes in contact with air, sunlight and/or an acidic environment, toxic hydrogen cyanide gases are formed." (*Id.* ¶ 27.) When the insured sought coverage for the defense of this action, it became the insurer's duty to provide the costs of that defense. Consistent with its obligation to the insured, it would have been appropriate to learn more about the cause and effect of the alleged 1984 release during the course of pretrial discovery in the Commonwealth Action. Perhaps the information would have supported one or more of the propositions that Century now advances. Instead, Century sat on the sidelines and the Commonwealth suit has ended. Century now owes Narragansett the costs of the defense.

The motion for reconsideration (Docket No. 112) is DENIED. The motion for certification pursuant to 28 U.S.C. § 1292(b) is also DENIED.

SO ORDERED.